UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS,
  Plaintiff

v.

SIMON PROPERTY GROUP, INC.,
  Defendant

Civil Action No. 04-12422-RCL

## DEFENDANT, SIMON PROPERTY GROUP, INC.'S
## RULE 12(b)(6) MOTION TO DISMISS

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendant, Simon Property Group, Inc. ("Simon")

hereby moves to dismiss the Commonwealth's action. In support of this Motion, Simon states as

follows:

1.     In the Complaint, the Commonwealth alleges that Simon Giftcards—the stored

value cards sold by Simon and issued by Bank of America, N.A. ("BOA")—contain expiration

dates and impose various fees in violation of M.G.L. c. 200A, § 5D, the Massachusetts gift

certificate law, M.G.L. c. 255D, § 1 and are unfair and deceptive in violation of M.G.L. c. 93A,

the Massachusetts Consumer Protection Act.

2.     The Court should dismiss this action pursuant to Fed. R. Civ. P. 12(b)(6) because

there is not set of facts upon which the Commonwealth can rely to sustain a viable claim.

Specifically, the action should be dismissed for two distinct reasons, both of which can be ruled

upon as a matter of law.

3.     First, the expiration date and fees the Commonwealth contends violate the

consumer protection act are terms of a stored value card issued by a national bank in accordance

with federal law and regulations, and conflicting state law on this subject is therefore preempted.

1

Pursuant to the National Bank Act of 1864, 12 U.S.C. § 21 *et seq.* and regulations of the Office of the Comptroller of the Currency, it is within the authorized powers of BOA to issue electronic prepaid products such as the Simon Giftcard, impose an expiration date in compliance with VISA regulations, charge and determine the amount of fees on the Giftcards, and provide disclosures of the terms and conditions of Simon Giftcards in accordance with federal requirements. Because the Simon Giftcards are authorized and regulated by federal law, M.G.L. c. 200A, § 5D, the Massachusetts gift certificate law, M.G.L. c. 255D, § 1 and M.G.L. c. 93A, the Massachusetts Consumer Protection Act, as applied to Simon Giftcards, are preempted.

4.    Second, this Court should dismiss this action because M.G.L. c. 200A, § 5D, the Massachusetts gift certificate law, M.G.L. c. 255D, § 1 and M.G.L. c. 93A, the Massachusetts Consumer Protection Act, as applied to the Simon Giftcard, improperly interfere with interstate commerce in violation of the Commerce Clause of the United States Constitution, U.S. Const. Art. I, § 8, cl. 3.e. The Simon Giftcards can be purchased out of state (including through Simon's internet website) and brought into Massachusetts. Similarly, the use of the Simon Giftcards is not limited to Massachusetts; rather, the Giftcards may be used nationwide and worldwide. It is not possible for Simon to control or to determine whether a particular Simon Giftcard sold out of state has made its way into Massachusetts, or vice versa. As such, the impact of Massachusetts law on Simon Giftcards cannot be limited to the Commonwealth. Thus, the effect of the application of M.G.L. c. 200A, § 5D, the Massachusetts gift certificate law, M.G.L. c. 255D, § 1 and M.G.L. c. 93A, the Massachusetts Consumer Protection Act to the Simon Giftcard would be to regulate commerce within other states with respect to this subject matter, to interfere with Congress' ability to regulate interstate commerce, and to impose

massive costs upon Simon and adversely impact the sale of Simon Giftcards in interstate

commerce, in violation of the Commerce Clause of the United States Constitution, U.S. Const.

Art. I, § 8, cl. 3.e.

     5.     In further support of this Motion, Simon relies upon its *Memorandum of Law in*

*Support of Its Motion to Dismiss* submitted herewith.

     WHEREFORE, Simon requests that this Court dismiss the Commonwealth's

enforcement action that was removed to this Court on November 16, 2004.

## <u>REQUEST FOR ORAL ARGUMENT</u>

     Because the Defendant believes oral argument will assist the Court, Therefore, pursuant

to Local Rule 7.1(d), Defendant requests that the Court schedule oral argument on this Motion to

Dismiss.

                SIMON PROPERTY GROUP, INC.,

                Defendant

                     /s/ Margaret M. Pinkham
                Paul W. Shaw (BBO No. 455500)
                Margaret Pinkham (BBO No. 561920)
                Daniel J. Brown (BBO No. 654459)
                Brown Rudnick Berlack Israels LLP
                One Financial Center
                Boston, MA 02111-2600
                Telephone:  617-856-8200
                Facsimile:  617-856-8201
                E-mail:pshaw@brownrudnick.com
                E-mail:mpinkham@brownrudnick.com
Dated:  December 6, 2004      E-mail:dbrown@brownrudnick.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2004, a copy of foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Pamela S. Kogut, Esq.
Diane Lawton, Esq.
Judith Whiting, Esq.
Assistant Attorneys General
Consumer Protection and Antitrust Division
One Ashburton Place
Boston, MA  02018

　　　　　　　　　　　　　　　　　　　　　　　　　／s／ Margaret M. Pinkham

Dated:  December 6, 2004　　　　　　　　　　Margaret M. Pinkham


#1315895 v\1 - browndj☐ - 7cn01!.doc☐ - 20345/24

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS,
   Plaintiff

v.                                            Civil Action No. 04-12422-RCL

SIMON PROPERTY GROUP, INC.,
   Defendant

## DEFENDANT, SIMON PROPERTY GROUP, INC.'S
## MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS

### INTRODUCTION

"This train wreck of a case arises out of a headlong collision between a state consumer-protection law and a federal banking law…. Federal law has the right of way in this area." *Greenwood Trust Co. v. State*, 971 F.2d 818, 821 (1st Cir. 1992). Pursuant to Fed. R. Civ. P. 12(b)(6), Simon Property Group, Inc. ("Simon") requests that this court dismiss the Commonwealth's enforcement action which seeks to prevent the sale of Simon Giftcards ("Giftcards")—a stored value card sold by Simon and issued by Bank of America, N.A. ("BOA"). In the Complaint, the Commonwealth alleges that the Giftcards contain expiration dates that violate M.G.L. c. 200A, §5D ("the Massachusetts Gift Certificate Law"), impose various fees in violation of M.G.L. c. 255D, §1 and are unfair and deceptive in violation of Chapter 93A, the Massachusetts Consumer Protection Act. The Court should dismiss this action because (1) the expiration date and fees the Commonwealth contends violate the gift certificate law are terms of a stored value card issued by a national bank in accordance with federal law and regulations, and state law on this subject is therefore preempted; and (2) Massachusetts gift certificate law, as applied to the Simon Giftcard, improperly interferes with

interstate commerce in violation of the Commerce Clause of the United States Constitution, U.S. Const. Art. I, § 8, cl. 3.

## STATEMENT OF FACTS

The following facts are taken from the allegations in the Commonwealth's Complaint and the Affidavit of Michele Sullender submitted with Simon's Motion for Preliminary Injunction in the related matter, Civil Action No. 04-12398-RCL.[1]

### The Simon Giftcard Program

Simon Property Group, Inc. operates malls and shopping centers in more than thirty states. Compl., ¶ 8. SPGGC, Inc., an affiliate of Simon Property Group, Inc., (collectively, "Simon"), is responsible for the nationwide Simon Giftcard program. Sullender Aff., ¶¶ 1, 2; Compl., ¶ 7. The Simon Giftcard is in the form of a credit-card-sized plastic card with a magnetic strip on the back. Sullender Aff., ¶ 5; Compl. ¶ 9. The front of the card bears a Simon insignia, as well as a VISA logo. Compl. ¶ 9. Simon also operates an Internet site (www.simon.com) and promotes Giftcards for sale on that site. Compl. ¶ 9. Currently, there are 159 malls selling Simon Giftcards in 35 states, including 14 in Massachusetts. Sullender Aff., ¶¶ 1, 2; Compl., ¶ 8.

The purchaser of a Giftcard specifies the amount desired to be placed on the Giftcard, ranging from $25-$500. Compl. ¶ 15. The Giftcard is subject to uniform terms and conditions, including administrative fees, which are presented to the purchaser in a brochure. Compl. ¶¶ 17-18, 20-22.[2] Some of the fees are even disclosed more than once in the terms and conditions presented to the purchaser, a copy of which is printed on the back of the cardboard

---

[1] For the Court's convenience, a copy of the Affidavit of Michele Sullender is attached as Exhibit D.

[2] As the State's complaint refers to both the Giftcard and the accompanying information, such as the brochure, Simon is attaching copies as Exhibits A-C hereto, and will provide the Court with an actual card and card sleeve and brochure.

sleeve in which the Giftcard is placed after it has been activated, as well as on the front of the cardboard sleeve, and on the back of the Card itself. Exs. A-C; Compl., ¶¶ 20, 22 (referencing cardboard sleeve and Giftcard brochure).

Additionally, to implement VISA fraud prevention and card maintenance requirements applicable to all cards bearing the VISA logo, all Giftcards expire a minimum of one year from the date of issuance. Sullender Aff., ¶ 13; *see* Compl., ¶¶ 16, 29. Depending on the date of purchase, the Giftcard may not expire until fifteen months after purchase. Sullender Aff., ¶13. While each particular card has an expiration date, the cardholder can transfer any value remaining at or after expiration to a new card by calling the number printed on the card carrier. *Id.* There is a $7.50 reissue fee associated with the issuance of a new card. Ex. C.; Compl., ¶ 18(d).

Unlike a traditional retail gift certificate, the Simon Giftcard can be used worldwide anywhere VISA debit cards are accepted, including locations not affiliated with Simon Malls. Compl., ¶ 9. Also unlike most gift certificates, a Simon Giftcard can be replaced if lost or stolen, and the Giftcard holder is not responsible for the unauthorized use of the Giftcard. Sullender Aff., ¶ 6; Compl., ¶ 18(c).

### Bank of America's Role In The Simon Giftcard Program

BOA is a VISA member bank, and therefore can issue VISA prepaid cards subject to VISA's regulations. Sullender Aff., ¶ 8; *see* Compl., ¶ 16. As stated on the back of every Giftcard, the card itself is issued by and is the property of BOA. *See* Exhibit A. BOA requires that all Giftcards and cardholder agreements identify BOA as the issuer. Sullender Aff., ¶ 8. The Giftcard is a VISA co-branded card between BOA and Simon, and it complies with federal banking regulations and all VISA U.S.A., Inc. regulations. *Id.*

3

The terms and conditions for the Simon Giftcard and the design of the card carrier in which the Giftcards are presented must be reviewed and approved by BOA. *Id.*, ¶ 9. Every time a change is made to the terms and conditions or the design of the card carrier, it must be sent to BOA for review and approval. *Id.* BOA also reviews and must approve the physical properties and design of the front and back of the Giftcard itself. *Id.*, ¶ 10. BOA, in compliance with directives from the Office of the Comptroller of the Currency ("OCC"), has required that certain information be disclosed on the Giftcard itself. *Id.* For example, BOA required the disclosure on the Giftcard of certain fee information as well as the website address at which additional information can be obtained. *Id.* Any changes Simon wishes to make to the Giftcard, including disclosures and typeface, must be reviewed and approved by BOA. *Id.*

## Wildcard Systems, Inc.'s Role In The Simon Giftcard Program

Wildcard is a processor of electronic stored-value plastic consumer gift cards that operates through the VISA network.[3] For a fee, Wildcard provides the actual Giftcards and provides program maintenance and consumer support for the Giftcard program. Compl. ¶ 14. Primarily, Wildcard provides the technology and the hardware to design, manufacture and encode the actual Giftcards and to manage the program. *See* Compl., ¶ 13-14.

## PROCEDURAL HISTORY

On November 12, 2004, Simon filed suit in this Court. Simon's complaint, as amended, seeks a declaratory judgment that the provisions of M.G.L. c. 200A, the Massachusetts gift certificate law, M.G.L. c. 255D, and M.G.L. c. 93A, as applied to the Giftcard, are (1) preempted by federal banking law and regulations; and (2) violate the Commerce Clause of the United States Constitution, U.S. Const. Art. I, § 8, cl. 3. Simon filed suit because the Massachusetts

---

[3] Information about Wildcard, as mentioned in the Commonwealth's Complaint, is available on Wildcard's website at http://corporate.wildcardsystems.com. *See* Compl. ¶ 13.

Attorney General's Office informed Simon that it planned to bring a civil enforcement action.[4]
On November 15, 2004, the Attorney General filed its enforcement action in state court.[5]  Simon
removed the state enforcement action to this Court, and on November 19, 2004, Simon moved to
consolidate the state and federal actions.

## ARGUMENT

### I.     Rule 12(b)(6) Standard

The standard for dismissal under Rule 12(b)(6) in the First Circuit is well settled.  In
ruling on such a motion, the facts and allegations set forth in the complaint must be viewed in the
light most favorable to the plaintiff.  *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16
(1st Cir. 1989).  The plaintiff, however, may not rely merely on "bald assertions" or
"unsupportable epithets" to establish its claim—the plaintiff must set forth factual allegations
supporting some actionable legal theory.  *Remco Distributors, Inc. v. Oreck Corp.*, 814 F. Supp.
171, 174 (D. Mass. 1992), *aff'd*, 981 F.2d 1245 (1st Cir. 1992).

Where the complaint presents no set of facts justifying recovery for the plaintiff, it is
subject to dismissal.  *Dartmouth Review*, 889 F.2d at 16 (affirming dismissal of discrimination
claim because no facts alleged that would warrant recovery).   Deficiencies in the complaint
which subject it to dismissal may consist of an absence of law or facts sufficient to support the
claim.  *See LaChapelle v. Berkshire Life Ins. Co.,* 142 F.3d 507, 509 (1st Cir. 1998) (dismissal
based on statute of limitations appropriate because if time-barred there is no right of recovery);

---

[4] Simon also brought similar declaratory judgment actions in the United States District Court for the District of New
Hampshire and the United States District Court for the District of Connecticut based on similar notice that the
Attorneys General of those states planned to bring civil enforcement actions against Simon based on gift certificate
laws and regulations in those states.  The Attorneys General of Massachusetts, New Hampshire and Connecticut had
coordinated efforts to bring suit against Simon.

[5] On November 15, 2004 the Attorneys General of New Hampshire and Connecticut also filed similar civil
enforcement actions against Simon in their states' courts.

*Day v. Moscow,* 955 F.2d 807, 811 (2nd Cir. 1992) (dismissal under Rule 12(b)(6) appropriate for claims barred by doctrine of *res* judicata).

A court may rely on materials outside of the pleadings and matters of which the court can take judicial notice in considering a motion to dismiss where they are central to the complaint. *Fudge v. Penthouse,* 840 F.2d 1012, 1015 (1st Cir. 1988), *cert denied,* 488 U.S. 821 (considering magazine article that plaintiffs alleged was libelous); *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 879 (1st Cir. 1991) (considering document plaintiffs alleged to be fraudulent); *Colby v. Hologic, Inc.,* 817 F. Supp. 204, 209 n.6 (D. Mass. 1993) (considering exhibits to complaint which formed basis of claim); *see also Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir. 1991) (stating that court can consider documents incorporated in the complaint by reference and matters of which judicial notice can be taken in considering Rule 12(b)(6) motion). This is especially true where nothing a plaintiff can introduce will affect "the disposition of the purely legal questions" raised in the motion to dismiss. *Fudge,* 840 F.2d at 1015.

The court can consider the Giftcard and brochure that are at the heart of this case in deciding this motion because they are central to the Commonwealth's claim and are referenced in the Complaint. *See Cortec Indus., Inc. v. Sum Holding, L.P.,* 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied,* 503 U.S. 960 (1992) (if plaintiff's claims are predicated on a document, movant may attach the document to a 12(b)(6) motion for consideration by the court even if plaintiff's complaint does not explicitly refer to it).[6]

---

[6] Additionally, if the court sees fit, it may consider additional evidence including affidavits and transform a motion to dismiss into a Rule 56 motion. *Fleming v. Lind-Waldock & Co.,* 922 F.2d 20, 23 (1st Cir. 1990); *see Collier v. City of Chicopee,* 158 F.3d 601, 603 (1st Cir. 1999) (conversion to summary judgment appropriate where party receives constructive notice that court may convert when movant attaches additional materials to motion); *Gurary v. Isaac Winehouse,* 190 F.3d 37, 43 (2d Cir. 1999) (conversion appropriate where plaintiff given notice that might be converted).

II.    **The Commonwealth's Claims are Without Merit and Should Be Dismissed.**

    A.    The National Bank Act of 1864, 12 U.S.C. § 21 *et seq.* and Regulations Issued by the Office of the Comptroller of the Currency Preempt the Commonwealth's Claims.

The National Bank Act authorizes BOA to issue stored value cards, impose expiration dates, and determine the fees to be charged for this service and the disclosure relating to those fees. Applying the Massachusetts gift certificate law to alter or prohibit the terms and conditions set by BOA for the Simon Giftcard would obstruct or impair the federal regulatory scheme applicable to fees and disclosure. The Commonwealth cannot avoid preemption by suing only Simon, who is not even the "issuer" or "owner" of the Giftcards. The claims the Commonwealth asserted against Simon as the seller of the Card would equally obstruct or impair the federal regulatory scheme, and are thus preempted. Because there are no facts that the Commonwealth can present to avoid this purely legal question of preemption, the Complaint against Simon should be dismissed.

    1.    **Bank of America, N.A. is a National Bank Whose Powers Are Granted by the Federal Government Subject to Regulation by the OCC Under the National Bank Act.**

As stated in the terms and conditions of the Giftcard, and as is printed on the back of the card itself, the Simon Giftcard is issued by and is the property of BOA. *See* Exs. A-C. BOA is a national bank formed under the National Bank Act ("NBA"). *See, e.g., Bank of America, N.A. v. Sorrell*, 248 F. Supp. 2d 1196, 1198 (N.D. Ga. 2002) ("Bank of America, a national bank ... is organized and exists under the National Bank Act."). As such, it is subject to extensive federal regulation, including the plenary authority of the OCC. *See, e.g., NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256 (1995) ("As the administrator charged with supervision of the National Bank Act ... the

Comptroller bears primary responsibility for surveillance of 'the business of banking' authorized by [the NBA].").[7]

Courts have held that state laws seeking to regulate national banks will be preempted where imposition of the state law would conflict with federal law, frustrate the purposes of the NBA, or impair the efficiency of national banks to discharge their enumerated or incidental powers. *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 561 (9th Cir. 2002); *see also Barnett Bank of Marion County, N.A. v. Nelson*. 517 U.S. 25, 31 (1996) (noting that state statute forbidding conduct by national bank that is authorized by federal law would "stand as an obstacle to the accomplishment of one of the Federal Statute's purposes") (internal quotations omitted). While "states retain some power to regulate national banks in areas such as contracts, debt collection, acquisition and transfer of property, taxation, zoning, criminal, and tort law," *Bank of America*, 309 F.3d at 559, states cannot "actually regulate the manner and content of the business of banking." OCC, "Preemption Determination and Order," 68 Fed. Reg. 46264, 46274 (Aug. 5, 2003).[8]

The OCC has enacted regulations addressing the applicability of state laws to the activities of national banks. *See* OCC Final Rule, "Bank Activities and Operations; Real Estate Lending and Appraisals," 69 Fed. Reg. 1904 (Jan. 13, 2004) (Appx., Ex. 2). The OCC regulations seek to insure that national banks avoid "the costs and interference that diverse and potentially conflicting state and local laws have on the ability of national banks to operate

---

[7] The NBA was enacted to establish a national banking system free from intrusive state regulation. *Bank of America v. City & County of San Francisco*, 309 F.3d 551, 561 (9th Cir. 2002), *cert. denied*, 123 S. Ct. 2220 (2003); *see also First Nat'l Bank of San Jose v. California*, 262 U.S. 366, 369 (1923) (noting congressional intent to avoid enactment of state legislation which, "might impose limitations and restrictions- as various and as numerous as the States."); *Easton v. Iowa*, 188 U.S. 220, 230 (1903) (national bank operations cannot be limited or controlled by state legislation). Grants of enumerated and incidental powers to national banks have been interpreted "as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law." *Barnett Bank of Marion County, N.A. v. Nelson*. 517 U.S. 25, 32 (1996).

[8] The various regulations, bulletins and letters issued by the OCC are included in the Appendix submitted with Simon's Complaint and Motion for Preliminary Injunction in the related action, Civil Action No. 04-12398-RCL.

under the powers of their Federal Charter." *Id.* at 1907-08.  The OCC Final Rule provides, in pertinent part:

> When national banks are unable to operate under uniform, consistent, and predictable standards, their business suffers, which negatively affects their safety and soundness.  The application of multiple, often unpredictable, different state or local restrictions and requirements prevents them from operating in the manner authorized under Federal law, is costly and burdensome, interferes with their ability to plan their business and manage their risks, and subjects them to uncertain liabilities and potential exposure. *Id.* at 1908.

With respect to national banks' deposit-taking, lending, and other operations, the OCC regulations provide that "state laws that obstruct, impair, or condition a national bank's ability to fully exercise the power in question are not applicable" to such banks. *Id.* at 1912; *see also* 12 C.F.R. §§ 7.4007, 7.4008, 7.4009, 34.4 (Appx., Exs. 3-6).  The regulations applicable to lending and deposit-taking list specific types of state law restrictions and requirements that are preempted by the NBA, including state law limitations on disclosures.  OCC Final Rule, 69 Fed. Reg. at 1916-17; 12 C.F.R. §§ 7.4007, 7.4008, 34.4.  The lists of preempted state laws "reflects [the OCC's] experience with types of state laws that can materially affect and confine - and thus are inconsistent with - the exercise of national banks' ... powers." OCC Final Rule, 69 Fed. Reg. at 1911.

> ### 2.  National Banks' Federally Authorized Powers Include the Power to Issue Stored Value Cards, Determine the Amount of Fees on Such Cards, and Impose an Expiration Date.

The NBA specifically grants national banks the power:

> To exercise ...  all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes ....

12 U.S.C. § 24 (Seventh).  The "business of banking" is not limited to the powers specifically enumerated in Section 24. *NationsBank*, 513 U.S. at 258 n.2.  The "incidental powers" granted

9

to national banks include "activities closely related to banking and useful in carrying out the business of banking." *Bank of America*, 309 F.3d at 562. The OCC has determined that the issuance of stored value cards is "part of or incidental to the business of banking." It has defined "electronic stored value products" or "smart cards" as follows:

> Electronic stored value products are retail payment products in which value is recorded on a personal electronic device or on a magnetic strip or computer chip in exchange for a predetermined balance of funds. Electronic stored value products may include stored value cards, smart cards, and electronic cash recorded on a personal electronic device, such as a personal computer.

OCC Bulletin, "Guidance on Electronic Financial Services & Consumer Compliance FFIEC Guidance," No. 98-31, 1998 WL 460874, at *8 (July 30, 1998) (Appx., Ex. 7). A national bank may provide through electronic means any product or service that it otherwise is authorized to perform or provide, including "offering electronic stored value systems." 12 C.F.R. § 7.5002(a)(3) (2004) (Appx., Ex. 8).

In Interpretive Letter No. 737, the OCC analyzed whether the activities of a proposed subsidiary of a national bank created to market and distribute stored value cards and operate a stored value program on behalf of the bank would be part of or incidental to the business of banking. OCC Interpretive Letter No. 737, 1996 WL 763025, at *3 (Dec. 1996) (Appx., Ex. 9). The OCC concluded that *when the affiliated entity of a national bank dispenses stored value to cardholders it is "performing the established banking functions of bill payment and dispensing of third party payment instruments." Id.* at *5 (emphasis added); *see* Conditional Approval No. 568, 2003 WL 252132,*3, *5 (Dec. 31, 2002) ("OCC has held that it is part of the business of banking for a national bank to develop, market, support, and operate electronic stored value systems.") (Appx., Ex. 10).

### a.    It is Within National Banks' Powers to Charge Fees for Services and Determine the Amount of Such Fees.

OCC Regulation 7.4002(a) provides that "A national bank may charge its customers non-interest charges and fees, including deposit account service charges." 12 C.F.R. § 7.4002 (2004) (Appx., Ex. 11).  The regulation also provides that "the establishment of non-interest charges and fees, their amounts, and the method of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles." *Id.*  For example, dormant account charges have been determined to be within the permissible fees that may be charged by national banks under this section. *See* OCC, Final Rule: "Investment Securities; Bank Activities and Operations; Leasing," 66 Fed. Reg. 34784, 34787 (July 2, 2001) ("dormant account charges ... continue to be permissible non-interest charges and fees even though they are no longer specifically mentioned in the rule") (Appx., Ex. 12).  Accordingly, the Commonwealth's efforts to abolish or control administrative fees on the Giftcard under M.G.L. c.255D, §1 conflicts with federal banking law.

### b.    It is Within National Banks' Powers to Impose an Expiration Date on a Stored Value Card.

The Commonwealth takes the position that BOA must issue cards in Massachusetts that do not expire for at least seven years after purchase pursuant to M.G.L. c.200A, §5D.  Compl. ¶ 16.  The OCC has specifically addressed the propriety of expiration dates on stored value cards, stating that a card issuer would be expected to disclose to a cardholder certain fundamental contractual terms of use including "expiration dates for the card." OCC Interpretive Letter No. 737, 1996 WL 763025 at *2 n.6 (Dec. 1996) (Appx., Ex. 13); *see also* OCC Bulletin, "Stored Value Card Systems," No. 96-48, 1996 WL 528481 at *2 (Sep. 10, 1996) (Stored value cards "could have specific features such as limits on the amount of electronic cash that can be stored or

11

cards that expire after some established time period.").[9]  As a result, a national bank is free to set whatever expiration date it deems appropriate, as long as it is disclosed.  The OCC and federal law are satisfied with the simple disclosure of the expiration date set by the national bank, irrespective of M.G.L. c.200A, §5D.

### 3.  The Commonwealth's Attempts to Regulate Expiration Date and Administrative Fees are Preempted.

Numerous courts interpreting preemption principles under the NBA have determined that state laws prohibiting or restricting the fees that may be charged in connection with a product or service offered by a national bank conflict with the bank's power to provide the service and charge the fees, and are therefore preempted.  For example, in *Wells Fargo Bank of Texas, NA v. James*,  the Fifth Circuit determined that a Texas statute that prohibited banks from charging fees to non-account holding payees for cashing checks drawn on the bank conflicted with national banks' power to impose such fees.  321 F.3d 488, 495 (5th Cir. 2003).  Because the state law conflicted with the OCC regulation, it was preempted as applied to national banks.  *Id.* at 491.  Similarly, in *Bank of America,* the Ninth Circuit held that municipal ordinances prohibiting banks from charging ATM fees to non-depositors conflicted with national banks' incidental powers to provide ATM services to non-depositors at a charge.  309 F.3d. at 564.  Again, because the state's attempt to restrict fees charged by a national bank

---

[9] The OCC has also provided guidance to financial institutions interested in issuing stored value products, suggesting that such institutions disclose information about the product to ensure informed use:

> [C]onsumers likely would find it beneficial to receive information about the terms and conditions associated with the use of electronic stored value products.  Some financial institutions that issue stored value products have provided consumers with a variety of disclosures including ... any expiration dates or limits on redemption of the electronic stored value ..  Some financial institutions have also printed some of this information, such as expiration date ...  directly on the card.

OCC Bulletin, "Guidance on Electronic Financial Services and Consumer Compliance FFIEC Guidelines," No. 98-31, 1998 WL 460874, *9 (July 30, 1998) (Appx., Ex. 7).

in connection with providing an authorized service conflicted with the OCC regulations authorizing the bank to charge a fee, the ordinances were preempted. *Id.*[10]

The New York Court of Appeals held that granting relief to plaintiffs who claimed fees charged by a national bank were excessive "would be to impose a limit on the amount Federally chartered banks can charge" for their services. *Howard L. Jacobs, P. C. v. Citibank, N.A.*, 462 N.E.2d 1182, 1183 (N.Y. 1984). The Court declined to take such action because this was a matter "more properly left to the Comptroller of the Currency who has decided that '[a]ll charges to customers would be arrived at by each bank on a competitive basis.'" *Id.*

Here, the Court should find the Commonwealth's claims preempted for the same reason – Massachusetts seeks to limit a national bank's power to issue stored value cards and to charge administrative fees or determine an expiration date in accordance with federal regulations. A state law determination that an administrative fee may not be charged on a stored value card issued by a national bank, or that the card can only expire after seven years, would directly conflict with BOA's powers to issue stored value cards, charge a fee in connection with that service, and determine the amount of the fee under federal standards. Therefore, the prohibitions contained in M.G.L. c.200A, c.255D and c.93A against administrative fees and expiration dates on the Simon Giftcard are preempted by federal law. *See, e.g., Wells Fargo*, 321 F.3d at 492 (state law that prohibited imposition of fee by national

---

[10] *See also Bank of America v. Sorell*, 248 F. Supp. 2d at 1199 (state law prohibiting bank from charging fees to non-accountholders who cashed checks drawn on bank was preempted because state law conflicted with powers granted to national banks); *Metrobank v. Foster*, 193 F. Supp. 2d 1156, 1161 (S.D. Iowa 2002) (Iowa law prohibiting national banks from charging non-accountholders fee for using ATMs preempted because it "is an obstacle to the rights given the National Banks by the OCC regulations."); *Mayor of the City of New York v. Council of the City of New York*, 2004 WL 235043, at *3 (N.Y. Sup. Ct. Jan. 26, 2004) (local law prohibiting city from doing business with "predatory" lenders was preempted by NBA to extent it set limit on non-interest fees that could be charged by national bank); *see generally* OCC Interpretive Letter No. 906, 2001 WL 258410 (Jan. 19, 2001) (describing national banks' legal challenges to state laws restricting ATM fees: "A national bank's authority to provide a product or service necessarily carries with it the authority to charge a fee for the product or service provided.") (Appx., Ex. 15).

bank conflicts with bank's federal power to charge fee and therefore is preempted); *Bank of America*, 309 F.3d at 561-64 (same); OCC Interpretive Letter No. 906, 2001 WL 258410 (because national banks are authorized to charge fees for their services and set the rates for such fees, state or local laws prohibiting such fees are preempted) (Appx., Ex. 15); *see also Boursiquot v. Citibank F.S.B.,* 323 F.Supp. 2d 350, 356 (D. Conn. 2004) (action under Connecticut Unfair Trade Practices Act preempted by federal law and dismissed because it would impact lending operations of a federal savings association).

4. **Preemption Applies when a State Law Restrains the Otherwise Lawful Activities of a National Bank Through its Affiliates.**

The preemption doctrine prohibits state regulation of products offered or issued by national banks in accordance with federal banking regulations. This prohibition is not limited solely to national banks, but also applies to the regulation of the <u>products</u> that originate from national banks regardless of whether they are offered directly by the national bank or through a third party. *See Krispin v. May Department Stores Co.*, 218 F.3d 919, 922 (8th Cir. 2000). In *Krispin*, the court held that claims against a department store contesting late fees charged on the store's credit cards which were issued by a national bank, were preempted by the NBA. 218 F.3d at 924. The plaintiffs, who were holders of the cards, brought the class action suit against the store alleging that it charged late fees in violation of a Missouri statute. *Id.* at 922. The court rejected the plaintiffs' argument that the department store could be held liable under state law because plaintiffs entered into agreements with the store, and the store had a right to receive the fees under an agreement with the bank. *Id.* at 923. Instead, the court determined that the deciding factor in whether NBA preemption applies is whether the national bank is the "originating entity." Because the bank issued the credit, it was the originating entity. The plaintiffs' claims therefore implicated the NBA and complete preemption applied. *Id.* at 924;

14

*see also* OCC Preemption Determination, 66 Fed. Reg. 28593, 28594-96 (May 23, 2001) (determining that NBA preempts state law regarding licensing where bank uses third parties in connection with offering and giving motor vehicle loans).

Similarly, in *Hudson v. Ace Cash Express, Inc.*, the court determined that the NBA preemption precluded the plaintiff's claims against all defendants, including the non-bank defendants, and dismissed the action pursuant to Rule 12(b)(6). 2002 WL 1205060 at *1 (S.D. Ind. May 30, 2002).[11] The plaintiff had obtained a $300 loan from an Indiana ACE Cash Express store that required payment of a $45 finance charge. The loan documents named a national bank as the actual lender. *Id.* at *2. ACE had an agreement with the bank to purchase a 95% participation interest in the loans extended by the bank to ACE's customers. The plaintiff alleged that ACE was solely responsible for collecting payments and fees. Plaintiff's claims were based on the premise that ACE was making loans that violated Indiana state law. *Id.* at *3. The plaintiff asserted that the NBA should not apply because the bank's role in servicing her loan was so small that ACE should be regarded as the true lender. *Id.* at *4. The court rejected this argument and found that because the loan was made by a national bank, the NBA governed the fees and interest rate charged on the loan, as a matter of law. *Id.* at *6. Accordingly, plaintiffs' claims arising out of the finance charge on the loan were preempted and the complaint was dismissed as against all defendants. *Id.* at *7-8.

---

[11] In discussing *Krispin*, the *Hudson* court noted that *Krispin* was decided on summary judgment while *Hudson* was decided on a motion to dismiss. *Hudson.*, 2002 WL 1205060 at *13-14. Thus, the court was "concerned only with the legal, not factual, sufficiency of the complaint." *Id.* at *14. This was of little importance because the allegations in the complaint paralleled the findings in *Krispin*, and therefore the same legal question was before the court. *Id.*; *see also Fudge v. Penthouse*, 840 F.2d 1012, 1015 (1st Cir. 1988), *cert denied*, 488 U.S. 821 (complaint may be dismissed where no facts will affect "the disposition of the purely legal questions"). A similar situation exists here, but is of little impact because BOA is the original issuer of the Giftcard. *See* Compl., ¶ 12-14. Therefore, the Commonwealth can present no set of facts warranting recovery, making dismissal appropriate.

In the Complaint, the Commonwealth mentions that Wildcard plays a role in the Simon Giftcard program, presumably in an attempt to avoid preemption in this case by mentioning another party. *See* Compl., ¶ 13-14. However, the fact that Simon and BOA outsource the technology and customer service for the Simon Giftcard program does not mean that the National Bank Act is inapplicable. In Interpretive Letter No. 737, the OCC opined that it would be appropriate for a national bank to acquire a minority interest in a Limited Liability Company ("LLC") that would provide the same services to the bank and its stored-value card program that Wildcard provides to BOA and Simon here (i.e. collection, processing, record keeping, providing hardware and software and customer support). OCC Interpretive Letter No. 737, 1996 WL 763025, at *1-3 (Dec. 1996) (Appx., Ex. 9). Thus, the bank was allowed to have an agent perform the same functions that Wildcard provides in this case, and the stored-value card system, which was "part of or incidental to the business of banking," was subject to OCC regulations. *See id.* at *10-11. In that situation, the LLC had no direct contract with the cardholder, but instead would have one agreement with the system customer (similar to Simon in this case) and a separate agreement with the issuer (similar to BOA here) and both the bank and the system customer would have their names printed on the card. *Id.* at *2. In allowing the bank to invest in a separate entity to administer the program, and stating that the program would be subject to OCC regulation, the OCC was granting permission for the bank to provide its services through an agent who would then sell the cards to a third party. *Id.*[12]

---

[12] *See also* OTS Opinion Letter No. P-2004-7, "Authority of a Federal Savings Association to Perform Banking Activities through Agents Without Regard to State Licensing Requirements," at 12 (Oct. 25, 2004), attached hereto as Exhibit E (Office of Thrift Supervision opined that agents used by federal savings association are not subject to state licensing requirements if the association would not be, because "[s]ubjecting federal savings associations that use agents to the burdens of complying with a hodgepodge of conflicting and overlapping state lending requirements undermines the federal objective of permitting federal savings associations to exercise their lending power under a single set of uniform federal laws and regulations.") (internal quotations omitted).

State courts have ruled that federal preemption is applicable to the Simon Giftcard in two recent cases in which consumers made the same arguments that the Commonwealth now seeks to litigate. In *Martin v. Simon Property Group Inc.,* the trial court dismissed three consolidated complaints against Simon, based, in part, on the court's conclusion that the plaintiffs' claims were preempted by federal law. No. 4317-000002 (Cal. Sup. Ct. May 25, 2004) (Appx., Ex. 17). The *Martin* plaintiffs challenged "the sellers of the bank cards failure to disclose information about fees that will be charged on the cards, fees that are actually charged, and/or restrictions or non-restrictions on the use of these cards that are not being disclosed." *Id.* at 3. Only Simon, as seller of the Simon Giftcard, was named as a defendant in the complaints. However, because the plaintiffs admitted that the Giftcards were issued by BOA and were in fact VISA prepaid cards, the court found that the challenged activities related to the business of banking and were within the sole regulatory authority of the OCC. *Id.* at 2, 3. The court held that the complaints were "an attempt to regulate the use of pre-paid bank cards and this Court is pre-empted from enforcing state laws which interfere with the right of the federal government to regulate this area." *Id.* at 3.

Similarly, in *Lonner v. Simon Property Group, Inc.*, the Commercial Division of the Supreme Court of New York dismissed the complaint alleging that imposition of administrative fees on the Simon Giftcard was a deceptive act and that Simon was unjustly enriched. Index No. 2246/04 (September 23, 2004, N.Y. Sup. Ct., Rudolph, J.) (Appx., Ex. 18). The *Lonner* court held that the complaint was analogous to that in *Krispin.* "[E]ven accepting as true the facts alleged in the pleading and submissions in response to the motion, and according the plaintiff the benefit of every possible favorable inference as must be done . . . . it is clear that the plaintiff's claims are preempted by federal law."

The overwhelming weight of authority is that the Commonwealth's claims against Simon are preempted--by trying to regulate the product issued and owned by BOA, the consequence of any enforcement action is to preclude BOA from continuing to issue Simon Giftcards in Massachusetts. As in *Krispin*, the bank is the "originating entity," because BOA issues and always owns the Giftcard. Under *Hudson*, Simon's role as a seller of BOA's product does not negate BOA's primary role in the transaction. The Commonwealth's claims against Simon not only implicate the NBA, there is an outright conflict with federal law and, as such, state law is preempted. *Cades v. H & R Block, Inc.*, 43 F.3d 869, 873-74 (4th Cir. 1994) (use of agents to solicit national bank customers does not destroy preemption of state law claims arising out of interest rate charged in connection with service of national bank). Here, the Commonwealth should not be permitted to do an end-run around federal preemption simply by failing to name the national bank that issues the Giftcard as a defendant. As a practical matter, if the Commonwealth's state law claims against the non-bank seller of stored value cards issued by national banks are not dismissed, then BOA will by necessity be forced to comply with, and will be subject to, the differing views of the 50 states as to what fees are appropriate and what is a proper expiration date. This result would frustrate the NBA's purpose of creating a national banking system free from varying state regulation. *See, e.g., First Nat'l Bank of San Jose v. California*, 262 U.S. 366, 369 (1923) (noting Congress' intent to create "a system extending throughout the country, and independent . . . of state legislation which, if permitted to be applicable, might impose limitations and restrictions as various and as numerous as the States."); OCC, Final Rule: Electronic Activities, 67 Fed. Reg. 34992, 34997 (May 17, 2002) ("Congress was concerned not just with the application of certain States' laws to individual national banks, but also with the application of multiple States' standards which

would undermine the uniform, national character of the powers of national banks throughout the system.").

B.   The Commonwealth's Complaint Should Be Dismissed Because, As Applied to Simon Giftcards, M.G.L. c.200A, c.255D and c.93A Violate the Commerce Clause.

Simon Giftcards are sold in more than 30 states, and over the Internet. Accordingly, the Giftcards can be purchased in other states and brought here by those who travel to Massachusetts to go to school, or vacation, or otherwise. In addition, the Giftcards are just that – gifts that are normally transferred from one person to another after purchase. The use of the Simon Giftcards is not limited to Massachusetts; rather, the Giftcards may be used nationwide and worldwide. It is not possible for Simon to control or to determine whether a particular Giftcard sold out-of-state has made its way into Massachusetts, or vice versa. As such, the impact of Massachusetts law on Simon Giftcards cannot be limited to Massachusetts. Applying Massachusetts state law to the Giftcard so as to require a minimum seven (7) year expiration date and prohibit administrative fees would have an extraterritorial reach. This would pose a severe burden on interstate commerce by forcing BOA and Simon to comply with Massachusetts law on a nationwide basis, regardless of whether the Simon Giftcards at issue are sold, or, indeed, ever used, within the borders of Massachusetts.

Moreover, Massachusetts is not the only state seeking to force BOA and Simon to comply with its particular gift certificate laws. On the very same day Massachusetts sued to enforce its laws, the Attorneys General of New Hampshire and Connecticut also brought enforcement actions against Simon to force it to comply with their states' gift certificate laws. This was no coincidence, but rather a coordinated effort between the neighboring states to enforce their respective laws against Simon during the height of the holiday shopping season.

However, the purpose of having one uniform system regulating bank-issued stored value cards under the NBA becomes clear when considering the burden placed upon BOA and Simon if the courts of these three states required the Giftcard to comply with the law in each state, all of which are wholly different.

For instance, Massachusetts requires an expiration of at least seven (7) years;[13] Connecticut prohibits any expiration date;[14] and New Hampshire prohibits expiration dates on Giftcards for $100 or less and only allows expiration of Giftcards for over $100 when the money escheats to the state as abandoned property.[15] While the states coordinated their enforcement effort, they certainly did not coordinate their legislative drafting efforts. With respect to Massachusetts, New Hampshire and Connecticut, the three states have three distinct regulatory schemes. To force BOA and Simon to comply a nationally issued and sold bank product to differing statutory requisites in every state would certainly impose an onerous burden on interstate commerce by forcing BOA and Simon to conform a universal bank product sold nationwide to the varying regulatory schemes of *all fifty states*. The unwieldy potential result could be Simon selling Giftcards with fifty different sets of terms and conditions.

The Commerce Clause states: "The Congress shall have Power ... To regulate Commerce ... among the several States...." U.S. Const. Art.. I, § 8 Cl. 3. This authority of Congress also implies a "dormant" limitation on the authority of the states to enact legislation affecting

---

[13] The Massachusetts Gift Certificate Law states: "A gift certificate...sold or offered to be sold shall be valid for not less than 7 years after its date of issuance." Mass. Gen. Laws ch. 200A, § 5D.

[14] The Connecticut Gift Card Law states: "No person may sell or issue a gift certificate that is subject to an expiration date." Conn. Pub. Acts 03-1, §84(a) (June 30 Special Session).

[15] The New Hampshire Consumer Protection Act prohibits the following: "Selling gift certificates having a face value of $100 or less to purchasers which contain expiration dates. Gift certificates having a face value in excess of $100 shall expire when escheated to the state as abandoned property pursuant to RSA 471-C." N.H. Rev. Stat. 358-A:2, XIII.

interstate commerce. *See Healy v. The Beer Inst.*, 491 U.S. 324, 326 (1989). The Supreme Court has recognized that "in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it." *So. Pac. Co. v. Arizona, ex rel. Sullivan,* 325 U.S. 761, 767 (1945). While that "residuum" may include state action promoting consumer protection, a finding that a state has acted for this purpose does not automatically end the inquiry. *See Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 350 (1977). State regulation, even related to consumer protection, will violate the Commerce Clause if it falls into one of three categories. *See Pharm. Research and Mfrs. of Am. v. Concannon,* 249 F.3d 66, 79 (1st Cir. 2001). First, a state statute is a per se violation of the Commerce Clause when it has an "extraterritorial reach." *Id.* Second, the court will apply strict scrutiny if a statute discriminates against out-of-state commerce in favor of in-state commerce, on its face or by its practical effect. *Id.* Finally, when a state statute regulates evenhandedly between in-state and out-of-state conduct, but has an incidental effect on interstate commerce, the court will uphold it "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefit." *Id.* at 80 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).

Addressing the first of these categories, the First Circuit explained the following:

> [A] state statute which has an "extraterritorial reach," whether intended or not, is a ***per se*** violation of the Clause. Thus, when a state statute regulates commerce occurring wholly outside the state's borders or when it has a practical effect of requiring out-of-state conduct to be carried on according to in-state terms, it will be invalid.

*Philip Morris, Inc. v. Reilly*, 2001 WL 1215365 at *13 (1st Cir. 2001) (citing *Concannon*, 249 F.3d at 79) (emphasis added). The Supreme Court applied the extraterritoriality principle in

*Healy*, in which the Court struck down a Connecticut statute requiring out-of-state beer shippers to affirm that their posted prices in Connecticut were no higher than their prices in neighboring states. 491 U.S. at 329. The Court explained that the practical effect of the statute must be evaluated by considering how it may interact with the regulatory regimes of other states, including "what effect would arise if not one, but many or every, State adopted similar legislation." *Id.* at 336. The Court held that the statute violated the Commerce Clause because it prevented brewers from pricing their product competitively in other states based on prevailing market conditions in those states. *Id.* at 338-39. The Court reasoned that the Commerce Clause "protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Id.* at 337.

Here, the Massachusetts gift certificate law, as applied to the Simon Giftcard, would force Simon and BOA to comply the terms of the Giftcard—a product sold and used nationwide—to the requirements of Massachusetts law, or to cease offering the product in Massachusetts or perhaps adjoining states since there is a high likelihood that cards sold elsewhere might be used in Massachusetts. At the same time, BOA and Simon would have to conform separate Giftcards to the different laws of Connecticut, New Hampshire, etc. Because Simon sells the Giftcards on the internet and in all Simon Malls nationwide, BOA and Simon would be forced to either conform all Giftcards to the laws of the most restrictive state, or sell separate Giftcards conforming to the regulations of each state.

Moreover, Simon would be forced to implement a complex scheme to conform the large number of Giftcards sold over the internet to the regulations of the state in which they were sold and, indeed, to determine which state's regulations would govern cards sold over the internet. For instance, if a consumer from Massachusetts were to buy a Giftcard online as a gift to a

relative in New Hampshire, Simon, which is based in Indiana, would have to determine which of these three states' laws would govern the Giftcard terms. Such a requirement would not only infringe on BOA's ability to issue the Giftcards under federal banking law, it would also unduly interfere with interstate commerce by allowing, in this case, Massachusetts law to govern transactions that take place wholly outside of the state.

Even if the Court were to find no *per se* violation, the Court must also consider whether the burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Concannon*, 249 F.3d. at 83 (quoting *Pike*, 397 U.S. at 142). In determining whether a statute violates this test ("the *Pike* test") the First Circuit has considered the following factors: "(1) the nature of the putative local benefits advanced by the statute; (2) the burden the statute placed on interstate commerce; and (3) whether the burden is 'clearly excessive' as compared to the putative local benefits." *Id.* at 84 (citing *Pike*, 397 U.S. at 142.)

In this case, the Giftcard is issued by BOA and is subject to OCC regulations, which provide uniform protection to consumers with respect to national bank products. Moreover, all the terms and conditions of the Giftcard are fully disclosed to consumers and the Giftcards have proved to be a popular product among consumers. The putative local benefits to consumers of applying Massachusetts law to the Giftcards, above and beyond the benefits of OCC regulation, simply do not outweigh the burden imposed on interstate commerce by requiring BOA to conform a product sold on a nationwide basis to the laws of each state. Doing so would defeat federal efforts to regulate bank products, including bank-issued stored value cards, on a uniform basis.

Furthermore, consumers and merchants alike would bear the burden of determining the various terms and conditions imposed on the Giftcard depending on the state in which it was sold

and/or used.  Because the law purports only to regulate gift certificates *"sold or offered to be sold"* in Massachusetts, Giftcards used in Massachusetts but sold in other states or over the internet would have different terms than those purchased in Massachusetts.  Merchants and consumers in Massachusetts, as well as outside of Massachusetts, would confront this problem.

Thus, M.G.L. c. 200A, c. 255D and c. 93A, as applied to the Simon Giftcard, constitute an improper interference by Massachusetts in interstate commerce in violation of the Commerce Clause of the United States Constitution, U.S. Const. Art. I, § 8, cl. 3, and the Commonwealth's action should be dismissed.

### CONCLUSION

Because the Commonwealth cannot present any facts to counter the fact that these claims are preempted by federal law, or to counter the fact that application of M.G.L. c. 200A, §5D ("the Massachusetts Gift Certificate Law"), M.G.L. c. 255D, §1 and M.G.L. c. 93A, the Massachusetts Consumer Protection Act to Simon Giftcards is a violation of the Commerce Clause of the United States Constitution, both of which are pure legal questions, the Commonwealth's action should be dismissed.

SIMON PROPERTY GROUP, INC.,

Defendant

_____/s/ Margaret M. Pinkham_____
Paul W. Shaw (BBO No. 455500)
Margaret Pinkham (BBO No. 561920)
Daniel J. Brown (BBO No. 654459)
Brown Rudnick Berlack Israels LLP
One Financial Center
Boston, MA 02111-2600
Telephone: 617-856-8200
Facsimile:  617-856-8201
E-mail:  pshaw@brownrudnick.com
E-mail:  mpinkham@brownrudnick.com
Dated:  December 6, 2004          E-mail:  dbrown@brownrudnick.com

## CERTIFICATE OF SERVICE

      I hereby certify that on December 6, 2004, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

Pamela S. Kogut, Esq.
Diane Lawton, Esq.
Judith Whiting, Esq.
Assistant Attorneys General
Consumer Protection and Antitrust Division
One Ashburton Place
Boston, MA  02018

                                             _____ /s/ Margaret M. Pinkham _____
Dated:  December 6, 2004                       Margaret M. Pinkham

#1315814 v\3 - browndj - 7@#03l.doc - 20345/24

**EXHIBIT A**







Merchants cannot access your card balance.

To check your balance:
- Visit www.simongiftcard.com
- Call toll free 1-888-205-9672
- Visit the Simon Marketplace

When using your Simon Giftcard to make a purchase that is greater than the amount on the card, tell the cashier you would like to pay the difference first, and then use your card to pay the balance.

EXHIBIT B



**EXHIBIT C**

## It's easy to use your Simon Gift Card.

### Let's get acquainted.

Please allow me to briefly introduce myself. I'm the Simon Gift Card, a prepaid card that lets you shop everywhere Visa debit cards are accepted. My value is limited to the amount of money that was stored on me at the time of purchase. Each time you use me, the amount is deducted from my balance. I know we're going to have a great time together, but before you put me in your wallet, sign me, write down my card number in a safe place, and please take a few moments to review some important information about me!

### What am I worth?
Always know the exact dollar amount available on your card. Merchants do not have access to this information and cannot determine the balance on your card. Check your balance at www.simongiftcard.com or by calling 1-888-203-9678.

### What happens when I'm not enough?
If you try to spend more than the amount available on your Simon Gift Card, the card will be declined. To purchase an item that costs more than the available amount on your card, you will need to combine the value of your Simon Gift Card with another form of payment. Follow these simple steps for a smooth transaction:
• Inform cashier in advance you will be using two forms of payment.
• Pay cashier the difference first with the alternate form of payment.
• Present the Simon Gift Card and state specific amount to be used.

### I can go anywhere Visa debit cards are accepted, but some places require special treatment.
The Simon Gift Card can be used anywhere Visa debit cards are accepted. You may find these tips helpful when using the card as:
• Restaurants and beauty salons. It's customary for service-oriented merchants to automatically factor in an additional 25% to cover any tip you may leave on the card. If your total bill, after adding in the additional 25%, exceeds the amount on the gift card, it will be declined. You should ensure that your gift card has an available balance that is 25% greater than your total bill.
• Gas stations. If you pay at the pump, the terminal may check to see if you have funds to pay for a minimum amount of $30 up to a maximum amount of $50 worth of gas. You can avoid this by prepaying for your gas inside the station.
• Hotels or car rental agencies. Companies specializing in travel services may automatically factor in an additional 25% to cover incidental charges that you might incur. You should ensure that your gift card has an available balance that is 25% greater than your rental bill.

### Cardholder Agreement/Gift Card Terms and Conditions
The following are the terms and conditions that govern the use of the Simon Gift Card ("Gift Card"). Please read them carefully and keep them for future reference. The Gift Card is neither a credit card nor an FDIC-insured deposit account. This Gift Card is issued by Bank of America, N.A., pursuant to license from Visa U.S.A., Inc. The purchaser agrees that all terms on the Gift Card and in these terms and conditions apply to purchaser and to any subsequent holder of the card by gift or otherwise. The Gift Card may not be exchanged or redeemed for cash or credit.

### Using This Gift Card
The Simon Gift Card is an instant-issue Visa prepaid card. The Gift Card may be used when making purchases from any merchant that accepts Visa debit cards. The total dollar amount of purchases made with the Gift Card will be automatically deducted from the value of the card. At the time of purchase, cardholder must sign the terminal receipt and keep it for his/her records. When using the Simon Gift Card in restaurants, drinking establishments, or hair and nail salons, please keep in mind that the proprietor might seek an authorization/approval on the card for an amount up to 25 percent more than the total bill. The entire amount approved remains unavailable for up to three business days. This is done to take into account a tip/gratuity; however, only the amount the cardholder authorizes will be deducted from the value of the card. Hotels, car rental agencies, and gas stations may also secure an authorization/approval on the card at a set limit above the final amount the cardholder authorizes. This is done to ensure that adequate funds are available to cover the final purchase. Cardholder can obtain additional information regarding the Simon Gift Card at the Simon Marketplace.

### Preauthorized/Recurring Payments
Cardholder agrees not to make preauthorized or recurring regular payments through the use of the Gift Card.

### Service Charge
There is an administrative fee of $2.50 per month, which will be waived for the first six months. Beginning in the seventh month after the card issue date, the administrative fee will be automatically deducted from the card balance on the first day of each month until the value reaches $0. A $5 fee will be assessed to replace a lost or stolen card. A $7.50 fee will be assessed to replace an expired card.

### Expiration
The Gift Card expires when the remaining value is $0 or on the expiration date shown on the front of the card, whichever comes first. If there is a balance remaining after the expiration date, cardholders can call 1-888-203-9678 at any time during the next 12 months for any longer period required by law to request that a new Gift Card be issued. The new Gift Card will have a value equal to the remaining balance of the expired card minus a $7.50 reissue fee. The expiration date on the new Gift Card will be at least one year from the date of reissue.

SIMON MALLS | more choices

simon.com

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SPGGC, INC.,
Plaintiff

v.

THOMAS F. REILLY, Attorney General,
Defendant

Civil Action No. 04-CV-

## AFFIDAVIT OF MICHELE SULLENDER IN SUPPORT
## OF THE MOTION FOR PRELIMINARY INJUNCTION

MICHELE SULLENDER, being duly sworn, deposes and says:

1.     I am Vice President, Product Development, for Simon Brand Ventures ("SBV"),

an affiliate of Simon Property Group, Inc., which owns, operates and manages regional shopping

malls throughout the United States ("Simon Malls").   I submit this affidavit in support of

SPGGC, Inc.'s motion for a preliminary injunction.   I am personally familiar with the facts

described herein.

2.     SPGGC, Inc. ("Simon") is the entity responsible for the nationwide roll-out of the

Simon Giftcard program.  SBV manages and markets the Giftcard program on behalf of Simon

and generally provides other services for programs or products offered to consumers.  I have

worked for SBV since December 30, 2000.  In this position I manage and direct all activities of

the Simon Giftcard program and was personally involved in the development and

implementation of the program.

### The Simon Giftcard Program In General

3.     In August of 2001, Simon began a pilot program for the Giftcard in five Simon

Malls.   The program was later expanded to other properties, and was implemented in the

majority of Simon Malls in 2003. Currently there are 159 malls selling Simon Giftcards in 35

states, including 14 Simon Malls in Massachusetts, three in New Hampshire and one in Connecticut. The Simon Giftcard became available for purchase over the internet on Simon's website in May of 2003.

    4.     The Simon Giftcard is a VISA prepaid card that operates on the Visa debit infrastructure.

    5.     The Simon Giftcard is a credit-card sized embossed plastic card with a magnetic strip on the back. The purchaser specifies the amount to be placed on the Giftcard, and the Giftcard is programmed to establish a balance in that denomination within certain parameters. The Giftcard is subject to uniform Terms and Conditions, which are available to the purchaser prior to purchase of the Giftcard and clearly printed on the outside of the card carrier in which the card is delivered to the purchaser. (A sample Simon Giftcard, card carrier, and explanatory brochure are appended as **Exhibit A, B and C**).

    6.     Unlike a traditional retail gift certificate, the Simon Giftcard can be used worldwide, anywhere VISA debit cards are accepted, including locations not affiliated with Simon Malls. Also unlike most gift certificates, a Simon Giftcard can be replaced if lost or stolen, and the Giftcard holder is not responsible for the unauthorized use of the Giftcard.

    7.     Another difference between the Simon Giftcard and gift certificates for retail stores is that the retailer benefits when the gift certificate is used to purchase goods and services from the retailer, whereas Simon (which does not profit from the underlying sale of goods and services) recovers its cost of the program and earns a profit primarily through fees associated with the Giftcard. Simon also receives, as does Bank of America, N.A., a portion of the interchange fee from VISA each time a Giftcard is used.

### Bank of America's Role In The Simon Giftcard Program

8.      Bank of America, N.A. ("BOA"), a national bank, has been the bank that has issued the Simon Giftcard since the inception of the program. The Simon Giftcard is a Visa co-branded card between BOA and Simon. It is issued by BOA and complies with federal banking regulations and all Visa U.S.A., Inc. regulations. BOA is a VISA member bank, and therefore can issue VISA prepaid cards subject to Visa's regulations. As stated on the back of every Simon Giftcard, the card itself is the property of BOA. BOA requires that all Giftcards and cardholder agreements identify BOA as the issuer.

9.      The terms and conditions for the Simon Giftcard are based substantially on the terms and conditions used on BOA's own branded gift card. The terms and conditions for the Simon Giftcard and the design of the card carrier in which the Giftcards are presented must be reviewed and approved by BOA. Every time a change is made to the terms and conditions or the design of the card carrier, it must be sent to BOA for review and approval.

10.      BOA also reviews and must approve the physical properties and design of the front and back of the Giftcard itself. BOA, in compliance with directives from its primary regulator, the Office of the Comptroller of the Currency ("OCC"), has required that certain information be included on the Giftcard itself. For example, BOA required the disclosure on the Giftcard of certain fee information as well as the website address at which additional information can be obtained. Any changes Simon wishes to make to the Giftcard, including disclosures and typeface, must be reviewed and approved by BOA.

11.      BOA receives compensation in connection with the Simon Giftcard in the form of a per transaction fee for each Giftcard transaction generating interchange fees from VISA. In addition, all Simon Giftcard program-related bank accounts are maintained with BOA.

## Terms and Conditions of the Simon Giftcard at Issue

12.    One term and condition of the Simon Giftcard is a $2.50 monthly service fee in the event a balance remains on the Giftcard after the sixth month. This fee is disclosed on the back of the card in bold font. The fee is deducted automatically on the first day of the month, starting on the seventh month after the month of purchase, from any remaining value on the card until the value reaches zero. Most Simon Giftcard holders never incur maintenance fees, as most of the value of the Simon prepaid Giftcards is used by consumers during the first month of ownership.

13.    Additionally, to implement VISA fraud prevention and card maintenance requirements applicable to all cards bearing the VISA logo, all Simon Giftcards sold in Massachusetts expire a minimum of one year from the date of issuance. Depending on the date of purchase, the Giftcard may not expire until fifteen months after purchase. While each particular card has an expiration date, the cardholder can transfer any value remaining at or after expiration to a new card by calling the number printed on the back of the card or the card carrier. There is a $7.50 reissue fee associated with the issuance of a new card.

## Present Controversy with the Massachusetts, New Hampshire and Connecticut Attorneys General

14.    On November 1, 2004, the Massachusetts Office of the Attorney General sent a letter to Simon Property Group, Inc. (**Exhibit D**). The Attorney General opined that the Simon Giftcard offered for sale in the various Simon Malls in Massachusetts is subject to the provisions of Mass. G.L. c. 200A, §5D, the Massachusetts gift certificate law. On the same day, the New Hampshire Attorney General sent a similar letter. (**Exhibit E**).

15.    The Massachusetts Attorney General alleged that the Simon Giftcards violate Mass. G.L. c. 200A, §5D because the Giftcards contain an expiration date less than seven years

from the date of issuance and potentially impose a variety of fees on gift card holders. The Attorney General asserts that Simon's alleged violation of the Massachusetts gift certificate law constitutes violations of the Massachusetts Consumer Protection Act, Mass. G.L. c. 93A, and further alleges that the fees charged by Simon to Giftcard purchasers and holders are unfair and deceptive acts and practices.

16.     The Massachusetts Attorney General has threatened to bring a civil enforcement action against Simon for injunctive relief and the payment of civil penalties, the costs of investigation, and restitution to consumers. The New Hampshire Attorney General also indicated her intent to commence legal action under NH RSA 357-A.

17.     I have been informed by our counsel at Brown Rudnick Berlack Israels LLP that on November 10, 2004, Assistant Attorney General Garry Desjardines of the Connecticut Attorney General's Office stated that the Connecticut Attorney General has been involved in coordinated discussions with representatives of the Massachusetts and New Hampshire Attorney Generals' Offices to bring suit against Simon and allege violations of the Connecticut Gift Certificate Act. As there is no notice provision in the Connecticut statute, the Connecticut Attorney General's Office has not served a notice of its intent on Simon. Attorney Desjardines advised Simon, through counsel, that a complaint has been drafted, and that the Connecticut Attorney General takes the same position on this matter as the Massachusetts Attorney General.

18.     While Giftcards are offered and purchased throughout the calendar year, the sales volume of Giftcards the last four weeks of the year increases exponentially. In fact, Giftcard sales for the month of December represent 50% of annual Giftcard sales. Sales of Giftcards in Massachusetts during December are in the tens of millions of dollars range, representing the purchase of hundreds of thousands of cards by Massachusetts consumers. Simon expects that

more than 100,000 Giftcards will be sold in New Hampshire during the holiday season and tens

of thousands will be sold in Connecticut. The Giftcard is a relatively new product that has been

quickly embraced by consumers as a product that offers convenience and almost universal appeal

to any recipient since it can be used for purchases at such a wide variety of locations.

19.     Simon customers represent a broad spectrum. There are individual shoppers who

buy Giftcards to give as gifts throughout the year, and especially during the holiday season, and

companies that purchase cards throughout the year to give to employees as a reward for good

performance or attendance, or to give as a holiday gift at the end of the year. Simon also has

promotional contracts or sponsorship agreements with a number of companies. For example,

Simon provides free ski lift tickets given by a sponsorship partner to every customer who

purchases a certain dollar amount of Giftcards. Simon also has an agreement to provide

Giftcards to certain radio stations that the stations give to listeners.

20.     The Massachusetts Department of Social Services ("DSS") is also a Simon

customer. DSS purchases Giftcards for foster families so that they can purchase food, diapers

and clothing for the children in their care.

21.     The prospect of having to deny its customers the Giftcard product – essentially

turning customers away – is one that will clearly impact its relationship with customers who will

have to scramble to find a replacement and who are likely to turn to a Simon competitor for a

similar product.

22.     Any inability on the part of Simon to sell Giftcards during the holiday season will

not only inconvenience Simon's customers, it will have a detrimental impact on the goodwill that

Simon, and SBV in particular, have striven to develop in the form of brand recognition and

loyalty among our customer base. Simon is in the business of providing customer service, and it

is not good service to not offer a product that the customer wants, and in many cases, has made a special trip to a Simon Mall to purchase.

23.    The Giftcard is the only product that Simon offers for sale to customers.  In the event that the Attorney General prevents Simon from selling its only product, it will suffer irreparable harm, and also may be exposed to contractual liability to its sponsorship partners since Simon will not be able to comply with its obligations to provide Giftcards.

Signed under the penalties of perjury this 11th day of November, 2004.

_Michele Sullender_

Michele Sullender

# EXHIBIT A







Merchants cannot access your card balance.

To check your balance:
- Visit www.simongiftcard.com
- call toll-free 1-866-xxx-xxxx
- visit the Simon Marketplace

When using your Simon Giftcard to make a purchase that is greater than the amount on the card, tell the cashier you would like to pay the difference first, and then use your card to pay the balance.

Important terms and conditions apply, please read them before using the card.

# EXHIBIT B



I'm a
SIMON™
for you

from

Purchase date:          Initial card value:

Keep track of the amounts you spend and the
balance on your card:

Amount spent          New balance
$ _____          $ _____
$ _____          $ _____
$ _____          $ _____

You can check your balance at:
• 1-888-203-9678.
• www.simongiftcard.com.
• the Simon Marketplace.

Remember to record your giftcard number in a safe place.

# EXHIBIT C

## It's easy to use your Simon Gift Card.

**Let's get acquainted.**
Please allow me to briefly introduce myself. I'm the Simon Gift Card, a prepaid card that lets you shop everywhere Visa debit cards are accepted. My value is limited to the amount of money that was stored on me at the time of purchase. Each time you use me, the amount is deducted from my balance. I know we're going to have a great time together, but before you put me in your wallet, sign me, write down my card number in a safe place, and please take a few moments to review some important information about me!

### What am I worth?
Always know the exact dollar amount available on your card. Merchants do not have access to this information and cannot determine the balance on your card. Check your balance at www.simongiftcard.com or by calling 1-888-203-9678.

### What happens when I'm not enough?
If you try to spend more than the amount available on your Simon Gift Card, the card will be declined. To purchase an item that costs more than the available amount on your card, you will need to combine the value of your Simon Gift Card with another form of payment. Follow these simple steps for a smooth transaction:
* Inform cashier in advance you will be using two forms of payment.
* Pay cashier the difference first with the alternate form of payment.
* Present the Simon Gift Card and state specific amount to be used.

### Never let me go.
Be sure to keep your Simon Gift Card (even after my balance has been depleted) in case you need to return any items purchased with the card.

### Know my number.
Keep a record of your Simon Gift Card number in a safe place, separate from your card.

### If you experience problems when we're shopping together, please review these helpful hints!

### I've been declined. Why?
If a merchant declines your card, immediately verify the balance on your card by calling 1-888-203-9678 or by visiting www.simongiftcard.com. The merchant cannot check your available balance.
* If the purchase is greater than the value on the card, follow the procedures outlined above for combining forms of payment.
* If your card was declined and there are insufficient funds to cover the purchase, contact our customer service center at 1-888-203-9678.

### I can go anywhere Visa debit cards are accepted, but some places require special treatment.
The Simon Gift Card can be used anywhere Visa debit cards are accepted. You may find these tips helpful when using the card at:
* **Restaurants and beauty salons.** It's customary for service-oriented merchants to automatically factor in an additional 25% to cover any tip you may incur on the card. If your total bill, after adding in the additional 25%, exceeds the amount on the gift card, it will be declined. You should ensure that your gift card has an available balance that is 25% greater than your total bill.
* **Gas stations.** If you pay at the pump, the terminal may check to see if you have funds to pay for a minimum amount of $30 up to a maximum amount of $50 worth of gas. You can avoid this by prepaying for your gas inside the station.
* **Hotels or car rental agencies.** Companies specializing in travel services may automatically factor in an additional 25% to cover incidental charges that you might incur. You should ensure that your gift card has an available balance that is 25% greater than your total bill.

### Do I ever expire?
Yes! Your Simon Gift Card expires when the remaining value is $0 or on the expiration date on the front of the card, whichever comes first. There is an administrative fee of $2.50 per month, which will be waived for the first six months. Beginning with the seventh month after the card issue date, the administrative fee will be automatically deducted from the card balance on the first day of each month until the value reaches $0. If you have a balance remaining after the expiration date, call 1-888-203-9678 to request a new card. The new gift card will have the value equal to the remaining balance of the expired card, minus a $7.50 reissue fee. Or apply the remaining balance before the expiration date toward the purchase of a new card (the handling fee for a new card will apply). See Terms and Conditions on back.

### Help! What if I'm lost or stolen?
Immediately report lost or stolen cards by calling 1-888-203-9678. You will need the card number to cancel the card and have a replacement card issued. Always keep a record of your Simon Gift Card number in a safe place, separate from the card.

## Cardholder Agreement/Gift Card Terms and Conditions
The following are the terms and conditions that govern the use of the Simon Gift Card ("Gift Card"). Please read them carefully, and keep them for future reference. The Gift Card is neither a credit card nor an FDIC-insured deposit account. This Gift Card is issued by Bank of America, N.A., pursuant to license from Visa U.S.A., Inc. The purchaser agrees that all terms on the Gift Card and in these terms and conditions apply to purchaser and to any subsequent holder of the card by gift or otherwise. The Gift Card may not be refunded or exchanged for cash or credit.

### Using This Gift Card
The Simon Gift Card is an instant-issue Visa prepaid card. The Gift Card may be used when making purchases from any merchant that accepts Visa debit cards. The total dollar amount of purchases made with the Gift Card will be automatically deducted from the value of the card. At the time of purchase, cardholder must sign the terminal receipt and keep it for his/her records. When using the Simon Gift Card in restaurants, drinking establishments, and hair and nail salons, please keep in mind that the proprietor might secure an authorization/approval on the card for an amount up to 25 percent more than the total bill. The entire secured amount may remain unavailable for up to three business days. This is done to take into account a tip/gratuity; however, only the amount the cardholder authorizes will be deducted from the value of the card. Hotels, car rental agencies, and gas stations may also secure an authorization/approval on the card at a set limit above the final amount the cardholder authorizes. This is done to ensure that adequate funds are available to cover the final purchase. Cardholder can obtain additional information regarding the Simon Gift Card at the Simon Marketplace.

Transactions made in currencies other than U.S. dollars will be converted to U.S. dollars under regulations established by Visa and may include a margin and/or fees charged directly by Visa. Conversion to U.S. dollars may occur on a date other than the date of the transaction; therefore, the conversion rate may be different from the rate in effect at the time of the transaction. Cardholder agrees to pay the converted amounts. For these transactions, the rate of exchange between the transaction currency and the billable currency is either a wholesale market rate or the government-mandated rate in effect one day prior to Visa International's processing date, increased by one percent.

After the amount available on the Gift Card has been exhausted, all transactions will be declined. Transactions that exceed the remaining card balance will also be declined.

To check the available balance on the Gift Card or to review recent transactions at no charge, cardholder may visit www.simongiftcard.com. Or cardholder can call 1-888-203-9678 at any time, 24 hours a day, seven days a week. The first balance inquiry by phone is free. Beginning with the second call, a $.50 charge per call will be assessed against the card balance. Cardholder may also visit the Simon Marketplace to review the card balance and recent transactions at no charge.

Bank of America, N.A., Visa, Simon Property Group, and their affiliates, employees, and agents are not responsible for the services or merchandise purchased with the Gift Card and are not responsible for the return or exchange of merchandise purchased with the Gift Card.

By use of this Gift Card, cardholder agrees that issuer is not liable for any consequential damages, direct or indirect. If cardholder thinks an error has occurred involving a transaction, that error needs to be adjusted and resolved with the merchant at whose establishment the Gift Card was used. Exchange or return of merchandise purchased in whole or in part with the Simon Gift Card will be governed by the procedures and policies of each merchant. If cardholder receives a credit, the credit may not be added to the available funds for seven business days. Return and refund policies are dependent on the merchant from whom the purchase was made. At the time of any exchange or return, cardholder should present both the merchandise receipt and the Gift Card.

### Error Resolution Procedures
In case of errors or disputes about transactions arising from the use of the Gift Card, call our customer service line at the phone number listed on the back of the card as soon as possible. We must hear from cardholder no later than 90 days after the date of the transaction in question, and cardholder must provide the following information:
* Cardholder name and Gift Card number;
* A description of the suspected error or the transaction cardholder is unsure about and an explanation as to why cardholder believes it is an error; and
* The dollar amount of the suspected error; and
* Gift Card's initial value and amount; and
* Information about the first most recent Gift Card transactions, if applicable.
If cardholder tells us by phone, we will require that cardholder send the complaint or question in a signed affidavit, within 10 business days. Generally, we will tell cardholder the results of our investigation within 10 business days after we hear from cardholder and will correct any error promptly. If we need more time, however, we may take up to 45 calendar days to investigate cardholder's complaint or question.

The Gift Card can be replaced if it is lost or stolen, with certain restrictions. Cardholder will be required to provide his/her name, the Gift Card number, original value, and transaction history in the event cardholder reports the Gift Card lost or stolen. Cardholder should immediately call 1-888-203-9678 to report a card lost or stolen. Simon Property Group reserves the right to require an affidavit and conduct an investigation into the validity of any request. Cardholder will not be liable for transactions identified by us as unauthorized. There will be a $5 reissue fee for any lost/stolen card, and it will be deducted from the balance on the card. A reissued card may take up to 30 days to process.

Disclosure of information about cardholder's Gift Card account or transactions to third parties will only be made when it is necessary to complete a transaction, when it is required to comply with government agency or court orders, or if cardholder gives written permission to do so.

The issuer may be liable for failure to complete transactions under certain circumstances, expressly excluding (but not by way of limitation) the following:
* If through no fault of ours, cardholder does not have enough money on the Gift Card to cover a transaction; or
* If the transaction would exceed cardholder's available funds; or
* If the terminal or system was not working properly; or
* If circumstances beyond our control (such as flood or fire) prevent the transaction, despite reasonable precautions that we have taken; or
* If there are other exceptions stated in these terms and conditions or provided by law.

### Preauthorized/Recurring Payments
Cardholder agrees not to make preauthorized or recurring regular payments through the use of the Gift Card.

### Service Charges
There is an administrative fee of $2.50 per month, which will be waived for the first six months. Beginning in the seventh month after the card issue date, the administrative fee will be automatically deducted from the card balance on the first day of each month until the value reaches $0. A $5 fee will be assessed to replace a lost or stolen card. A $7.50 fee will be assessed to replace an expired card.

### Expiration
The Gift Card expires when the remaining value is $0 or on the expiration date shown on the front of the card, whichever comes first. If there is a balance remaining after the expiration date, cardholder can call 1-888-203-9678 at any time during the next 12 months (or any longer period required by law) to request that a new Gift Card be issued. The new Gift Card will have a value equal to the remaining balance of the expired card, minus a $7.50 reissue fee. The expiration date on the new Gift Card will be at least one year from the date of reissue.

**SIMON** MALLS | more choices℠

simon.com

11/01/2004 16:38 FAX ⬛002



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL
### ONE ASHBURTON PLACE
### BOSTON, MASSACHUSETTS 02108-1598

THOMAS F. REILLY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

November 1, 2004

**By Overnight Mail**

Richard S. Sokolov, President and Chief Operating Officer
Simon Property Group, Inc.
115 West Washington Street
Indianapolis, IN 46204

RE:    Simon Gift Cards

Dear Mr. Sokolov:

The Consumer Protection and Antitrust Division of the Massachusetts Attorney General's Office has investigated the practices of your company in connection with the Gift Card your company offers for sale in its 14 Massachusetts Simon Malls and online to Massachusetts consumers. Based upon this investigation, the Attorney General has reason to believe that Simon Property Group, Inc. ("Simon") has engaged in unfair and deceptive acts and practices in violation of the Massachusetts Consumer Protection Act, G.L. c. 93A.

Specifically, this Office has reason to believe that Simon has sold and continues to sell Gift Cards with a one-year expiration date, thus violating G.L. c. 200A, § 5D, the Massachusetts gift certificate law, which provides that gift cards may not expire before the passage of seven (7) years. Further, Simon imposes a variety of fees on gift card holders, in violation of G.L. c. 200A, § 1, which contemplates that fees not be charged *at all* to gift card holders. Violations of the Massachusetts gift certificate law constitute violations of the Massachusetts Consumer Protection Act, G.L. c. 93A. In addition, the fees Simon charges to Gift Card purchasers and holders are unfair and deceptive in violation of the Massachusetts Consumer Protection Act: the fees are unconscionable or otherwise unfair, and are not adequately disclosed to consumers, and are therefore deceptive.

This letter is to inform you that the Attorney General is preparing to take legal action against Simon. We will seek an appropriate judgment to bar future unlawful conduct and the payment of civil penalties, costs of investigation including attorneys' fees, and restitution, if appropriate, for consumers. However, we wish to give your company and your attorney an opportunity to meet with us prior to commencing legal action.

In the event we are unable to resolve this matter, this will serve as formal notice, given

Mr. Sokolov
November 1; 2004
Page Two

pursuant to G.L. c. 93A, § 4, of the Attorney General's intention to bring suit against Simon not earlier than five (5) days after you receive this letter, based on the violations set forth above.

        We are available to meet with you to discuss this case and to attempt to reach a settlement prior to instituting suit.

                                    Very truly yours,

                                    Pamela Kogut
                                    Diane Lawton
                                    Judith Whiting
                                    Assistant Attorneys General
                                    Consumer Protection and
                                    Antitrust Division
                                    (617) 727-2200, ext. 2988


cc:    Marilyn D. Stempler, Esq. *(By facsimile)*

# ATTORNEY GENERAL
# DEPARTMENT OF JUSTICE

NOV - 2 2004

33 CAPITOL STREET
CONCORD, NEW HAMPSHIRE 03301-6397

KELLY A. AYOTTE
ATTORNEY GENERAL



MICHAEL A. DELANEY
DEPUTY ATTORNEY GENERAL

November 1, 2004

*Via UPS Overnight Mail*

Richard S. Sokolov, President and Chief Operating Officer
Simon Property Group, Inc.
115 West Washington Street
Indianapolis, IN 46204

RE:    Simon Gift Cards

Dear Mr. Sokolov:

The Office of the Attorney General of the State of New Hampshire has reason to believe that Simon Property Group, Inc. ("Simon") has engaged in unfair and deceptive acts and practices in violation of the New Hampshire Consumer Protection Act, NH RSA 358-A ("the Act"), by the sale of Simon Gift Cards ("the Cards") at various malls in New Hampshire and online.

Of specific concern are the following:

- The fees charged consumers who purchase and use the Cards are in direct conflict with NH RSA 358-A:2, XIII, which forbids "[d]ormancy fees, latency fees, or any other administrative fees or service charges that have the effect of reducing the total amount for which the holder may redeem a gift certificate."

- The Cards bear an expiration date, which is also in direct conflict with same paragraph, which explicitly forbids the selling of gift certificates that contain expiration dates.

This Office is required to provide a 10-day notice of any intent to commence legal proceedings under the Act. The purpose of this notice period is to provide you with an opportunity to confer with the Attorney General, or a designated representative, prior to the commencement of legal action. Accordingly, this letter shall serve as notice of the State's intent.

We are available to meet with you to discuss this matter, and to attempt to reach a settlement prior to instituting suit, and we urge you to take advantage of this opportunity.

Very truly yours,

Richard W. Head
Senior Assistant Attorney General

David A. Rienzo
Assistant Attorney General
Consumer Protection and
Antitrust Bureau
(603) 271-3643

RWH/DAR:lm
cc:    Marc R. Scheer, Esquire



**P-2004-7**

**Office of Thrift Supervision**
Department of the Treasury                                    *John E. Bowman, Chief Counsel*

1700 G Street, N.W., Washington, DC 20552 • (202) 906-6372

October 25, 2004

[                    ]
[                                ]
[                    ]
[                                ]

Re:     Authority of a Federal Savings Association to Perform Banking Activities
           through Agents Without Regard to State Licensing Requirements

Dear Mr. [        ]:

This responds to your recent inquiry on behalf of [
                                    ], a federal savings association ("Association") and a
wholly-owned subsidiary of [                                            ]
("Affiliate"). The Association uses agents to perform certain marketing, solicitation, and
customer service activities related to the Association's authorized deposit and loan
products and services, and other authorized banking powers. The Association controls
the agents' performance of activities on behalf of the Association. You ask whether such
agents are subject to state licensing or registration laws by reason of performing such
activities on behalf of, and as agents for, the Association.

In brief, we conclude that when the Association uses agents in the manner the
Association has described to perform marketing, solicitation, and customer service
activities related to the Association's deposit and loan products and services and other
authorized banking powers, state licensing and registration requirements that do not apply
to the Association also do not apply to the Association's agents solely because they
perform those activities for the Association.

2

# I. Background

## A. The Association's Authorized Activities

The Association offers a variety of deposit and loan products and services on a nationwide basis. These include traditional thrift products and services, such as deposit accounts, various types of certificates of deposit,[1] checking accounts, money market accounts, health savings accounts, other transaction accounts, mortgage loans, proprietary credit and debit cards, car loans and leases, consumer and other loans, and servicing of benefit management accounts for insurance and annuity beneficiaries. The Association uses [                                        ] agents to market and solicit customers for the Association's deposit and loan products and services. The Association and the agents enter into contractual arrangements pursuant to which the agents ("Agents") are independent contractors and exclusive agents of the Association for purposes of activities relating to banking products and services.[2] The Agents are not employees of the Association or of the Affiliate.

The information you have provided indicates that the Agents display in their offices information and brochures relating to the Association's banking products and services. The Agents also mail marketing materials to the Affiliate's customers and other potential customers, and apprise them of the availability of the Association's products and services through telephone and personal contacts. The Agents thus assist the Association in creating customer awareness of the Association's products and services.

The Agents direct potential customers and borrowers to the Association, and may assist individuals in completing application forms and documentation for Association deposit and loan products and services. For example, if a customer expresses interest in a deposit or loan product, the Agent might supply the customer with an application form, assist the customer in completing the application, answer questions and, at the customer's request, transmit the completed application (and any check to be used to open an account) to the Association. The Agents thus perform various customer service functions.

You represent that the Agents do not open accounts, accept deposits or payments, cash checks, handle any deposit transfers or withdrawals, evaluate or review applications (except for completeness), approve loans, or make any other substantive decisions on

---

[1] The Association offers fixed rate, variable rate, and jumbo certificates of deposit. The Association does not offer callable certificates of deposit.

[2] The Agents are "exclusive" to the Association with respect to banking products and services in that the Agents do not perform activities related to banking products and services for any other entity, and no other entity controls the activities of the Agents with respect to the Association's banking products and services. [                                                    ]

3

behalf of the Association.  Deposit accounts are not opened until the application and funds are received and accepted by the Association.  Similarly, the Association makes the decisions on all loan applications and other transaction matters, prescribes the terms of loans, deposit products and other services, and accepts the deposit or approves the loan.

According to the materials you submitted, to be eligible to market the Association's products and services, an Agent must enter into an exclusive agreement with the Association and complete a required education and training program provided by the Association.  The written agreement between the Association and each Agent sets forth the duties, obligations, and limitations of the parties, including provisions to the effect that: (i) the Agent is prohibited from selling financial products and insurance issued by entities other than the Association, the Affiliate, and affiliated entities of either; (ii) the Agent has no authority to bind, commit, or make decisions for the Association; (iii) the Agent may not accept cash or other deposits from customers, cash checks, disburse loan proceeds to customers, or collect or accept loan payments from customers; and (iv) the Agent is an independent contractor.  The Association pays the Agents for their efforts based on transactions actually consummated by the Association.

You advise that the required education and training program that the Agents must complete pertains to the Association's products and services, as well as federal compliance laws.  One purpose of the training is to ensure that the Agents are aware of, and that they apprise customers of, appropriate distinctions between federally-insured deposit products and other financial products that the Agents may offer.  Another purpose of the training is to educate the Agents about applicable federal compliance laws. [3]  In addition, you represent that the Association conducts comprehensive compliance oversight of the Agents, and that the Association's internal audit committee periodically conducts reviews of the Agents.  No entity other than the Association controls the Agents' performance of activities for the Association.

You indicate that in several states where the Agents are conducting activities on behalf of the Association questions have arisen as to whether the Agents must comply with various state registration or licensing requirements for mortgage lenders, loan

---

[3] Federal compliance laws and regulations include, for example, the Truth in Savings Act, 12 U.S.C.A. § 4301 *et seq.* (West 2001 & Supp. 2004) and Regulation DD, 12 C.F.R. Part 230 (2004); the Truth in Lending Act, 15 U.S.C.A. § 1601 *et seq.* (West 1998 & Supp. 2004 ) and Regulation Z, 12 C.F.R. Part 226 (2004); the Equal Credit Opportunity Act, 15 U.S.C.A. § 1691 *et seq.* (West 1998 & Supp. 2004) and Regulation B, 12 C.F.R. Part 202 (2004); OTS regulations on Consumer Protection in Sales of Insurance, 12 C.F.R. Part 536 (2004); and OTS Nondiscrimination Requirements, 12 C.F.R. Part 528 (2004). *See also* Interagency Statement on Retail Sales of Nondeposit Investment Products (February 15, 1994), *Appendix A to § 710 of the OTS Thrift Activities Handbook.* We note that with respect to mortgage loans, the Association must ensure that its arrangements with the Agents comply with the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C.A. § 2601 *et seq.* (West 2001 & 2004 Supp.) and Regulation X, 24 C.F.R. Part 3500 (2004); we do not address that matter in this opinion.

4

brokers, broker-dealers, deposit brokers, agents, and the like.[4] Heretofore, the Association has dealt with this issue on a case-by-case, state-by-state, basis. The Association has engaged in lengthy discussions and written communications with numerous states. The Association has reached agreements with several states pursuant to which the states do not object to the Agents performing specified activities on behalf of the Association without complying with state licensing or registration requirements. Other states have taken the position that the Agents, even though acting on behalf of the Association, must comply with state mortgage broker or securities licensing and registration requirements (or both) when engaging in the activities described above. As a result, the Association has chosen not to market or offer certain of its products in particular states. In other instances, only after the Association had spent considerable time and effort in discussions with a state, did the state agree to grant the Agents an "exemption" from the state licensing or registration requirement or take a "no-action" position with respect to the requirement.

In some cases, to satisfy state officials, the Association has committed to be responsible for the mortgage loan brokerage activities of the Agents, including providing sufficient bonding and training, and to provide the state with all records that relate to the mortgage loan brokerage activities of the Agents. In still other cases, states have insisted on compliance with state licensing or registration requirements, and the Association, at considerable expense, has paid the license and registration fees so that the Agents can market the Association's products and services in those states.[5] Accordingly, you ask for a determination whether such state licensing and registration requirements are applicable when the Association chooses to use the Agents to perform marketing, solicitation, and customer service activities on behalf of the Association, or whether federal law preempts such state requirements.

### B. Description of State Laws

You indicate that several different types of state registration and licensing laws are at issue. Several states purport to require licensing or registration as a precondition to the marketing or offering for sale of traditional banking products, such as certificates of deposit and mortgage loans. Thus, a state might require that anyone marketing or offering for sale certificates of deposit be registered with the state as a registered

---

[4] You advise us that more than 25 states have: (i) mortgage lender or broker licensing requirements, some of which include experience requirements, for offering or marketing first or second mortgages; (ii) registered representative requirements for offering or marketing certificates of deposit; or (iii) some combination of both requirements.

[5] The Association estimates that it pays approximately $[ ] million annually in state registration and licensing fees for the Agents.

5

representative, or possess a securities license.[6]  For example, one state apparently interprets the term "security" to include certificates of deposit and generally requires that anyone marketing a security be a registered representative.[7]  Other state laws purport to require a mortgage lender or mortgage broker license as a precondition to marketing first or second mortgages.[8]  Still other state laws impose prior experience requirements for marketing first and second mortgages, in addition to licensing requirements.[9]  Some of these state laws contain exclusions or exemptions that would apply to the Association (and its employees) if the Association were directly marketing or offering its deposit and loan products itself and not using the Agents.

## II. Discussion

### A. Statutory and Regulatory Framework

#### 1. OTS Possesses Plenary Authority Over Federal Savings Associations and Their Operations

In enacting the Home Owners' Loan Act ("HOLA"),[10] Congress required OTS and its predecessor, the Federal Home Loan Bank Board ("FHLBB"), to organize and charter "thrift institutions for the deposit of funds and for the extension of credit for homes and other goods and services," and to provide for the organization, incorporation, examination, operation, and regulation of federal savings associations "giving primary

---

[6]  For instance, you advise that several states, including Georgia (Ga. Code Ann. § 10-5-3), Idaho (Idaho Code § 30-1406), Maine (Me. Rev. Sat. Ann. tit. 32, § 10301(1)), North Carolina (N.C. Gen. Stat. § 78A-36(a)), and Ohio (Ohio Rev. Code Ann. §§ 1707.14 and 1707.16), require that an Agent marketing certificates of deposit be a registered representative, and that Hawaii (Haw. Rev. Stat. § 485-14), Mississippi (Miss. Code Ann. § 75-71-301), and Wyoming (Wyo. Stat. Ann. § 17-4-103) impose a similar requirement for marketing jumbo certificates of deposit.  You advise that in Vermont (Vt. Stat. Ann. tit. 9, § 4213(a)) and West Virginia (W. Va. Code § 32-2-201(a)), marketing certificates of deposit requires a Series 63 license or registered representative status.

[7]  You advise that this has been the long-standing position of the State of Illinois.

[8]  You advise that some type of mortgage broker license is required by several states, including Connecticut (Conn. Gen. Stat. Ann. §§ 36a-486 and 36a-511), the District of Columbia (D.C. Code Ann. § 26-1103), Florida (Fla. Stat. § 494.0033), Georgia (Ga. Code Ann. § 7-1-1002), Maryland (Md. Code Ann. § 11-504), Michigan (Mich. Comp. Laws. Ann. §§ 445.1652 and 493.52), New Hampshire (N.H. Rev. Stat. Ann. §§ 397-A:3 and 398-A:1-a), North Carolina (N.C. Gen. Stat. § 53-243.02), Ohio (Ohio Rev. Code Ann. § 1322.02), Pennsylvania (63 P.S. § 456.303 and 7 P.S. § 6603), Virginia (Va. Code Ann. § 6.1-410), and Washington (Wash. Rev. Code § 19.146.200).

[9]  For example, Connecticut (Conn, Gen. Stat. Ann. §§ 36a-488 and 36a-513), Maryland (Md. Code Ann. § 11-506(b)), and Ohio (Ohio Rev. Code Ann. § 1322.03(A)(4)) each have an express three-year prior mortgage experience requirement.

[10]  12 U.S.C.A. § 1461 *et seq.* (West 2001 & Supp. 2004).

6

consideration of the best practices of thrift institutions in the United States."[11] The comprehensiveness of the HOLA language demonstrates that Congress intended the federal scheme to be exclusive, leaving no room for state regulation, conflicting or complementary.[12]

Sections 5(b) and 5(c) of the HOLA authorize federal savings associations to offer deposit and other accounts, and to make a variety of loans and investments.[13] To implement these and other provisions of the HOLA, OTS has promulgated extensive regulations governing federal savings association operations, including deposit and lending activities.[14] OTS's long-standing regulation on federal preemption in the area of federal savings association operations, § 545.2, affirms "the plenary and exclusive authority of [OTS] to regulate all aspects of the operations of Federal savings associations."[15] OTS has made clear in its deposit and lending regulations its intent to give federal savings associations maximum flexibility to exercise their deposit and lending powers in accordance with a uniform federal scheme of regulation that occupies the field of regulation for deposit and lending activities.[16] OTS regulations also make clear that OTS occupies the fields of lending regulation and deposit regulation of federal savings associations to facilitate and enhance safe and sound operations and to enable federal savings associations to conduct their operations in accordance with best practices by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden.[17]

It is well established that federal savings associations may exercise their authorized deposit and lending powers without regard to state laws that purport to regulate or otherwise affect those powers,[18] including state licensing and registration

---

[11] Section 5(a) of the HOLA, 12 U.S.C.A. § 1464(a) (West 2001).

[12] *See Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("*de la Cuesta*"); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).

[13] 12 U.S.C.A. § 1464(b) and (c) (West 2001 & Supp. 2004).

[14] *See e.g.*, 12 C.F.R. Parts 545 (Federal Savings Associations-Operations), 555 (Electronic Operations), 557 (Deposits), and 560 (Lending and Investment) (2004).

[15] 12 C.F.R. § 545.2 (2004). This regulation originally was promulgated in 1983 by OTS's predecessor agency, the FHLBB. *See* 48 Fed. Reg. 23032, 23058 (May 23, 1983).

[16] 12 C.F.R. §§ 557.11(b) and 560.2(a) (2004).

[17] 12 C.F.R. §§ 557.11(a) and 560.2(a) (2004).

[18] *See* 12 C.F.R. §§ 557.11(b) and 560.2(a) (2004). *See also* 12 C.F.R. § 545.2 (2004) (OTS's exercise of its authority to promulgate regulations "is preemptive of any state law purporting to address the subject of the operations of a Federal savings association").

7

requirements.[19]  Thus, for example, federal savings associations are not subject to state licensing and registration requirements pertaining to mortgage and consumer lending, deposit taking, and other banking activities.[20]

Inherent in the authority of federal savings associations to exercise their deposit and lending powers and to conduct deposit, lending, and other banking activities is the authority to advertise, market, and solicit customers, and to make the public aware of the banking products and services associations offer.  The authority to conduct deposit and lending activities, and to offer banking products and services, is accompanied by the power to advertise, market, and solicit customers for such products and services.  Federal savings associations also have the authority to choose the vehicles they will use to market their products and reach potential customers.  A grant of authority to offer deposit and loan products and services without the corresponding authority to market and solicit potential consumers for those products and services would render the grant of authority meaningless.  Such marketing and solicitation are subject to regulation by OTS.[21]  A state may not put operational restraints on a federal savings association's ability to offer an authorized product or service by restricting the association's ability to market its products and services and reach potential customers.

## 2.  OTS Possesses Statutory Authority to Regulate and Examine Third Parties, Including Agents

Consistent with OTS's exclusive authority to supervise, regulate, and examine the operations of federal savings associations, OTS also is authorized by statute to regulate and examine entities with which a federal savings association contracts.  Thus, OTS has authority under the HOLA to regulate the Agents the Association uses to perform marketing, solicitation, and customer service activities.  The Examination Parity Act, codified as § 5(d)(7) of the HOLA,[22] provides that if a savings association

causes to be performed for itself, by contract or otherwise, any service authorized under [the HOLA] . . . whether on or off its premises –

(i) such performance shall be subject to regulation and examination

---

[19]  12 C.F.R. §§ 557.12(g) and 560.2(b)(1) (2004).

[20]  *See* OTS Op. Chief Counsel (July 26, 1999) and opinions cited therein at notes 37 and 38.

[21]  *See e.g.*, OTS regulations 12 C.F.R. § 563.27 (advertising) and 12 C.F.R. Part 528 (nondiscrimination requirements in lending and other services, advertising, applications, etc.).

[22]  The Examination Parity and Year 2000 Readiness for Financial Institutions Act, Pub. L. 105-164, 112 Stat. 32, 33-35 (March 20, 1998), codified at 12 U.S.C.A. § 1464(d)(7), added § 5(d)(7) to the HOLA.

8

by the [OTS] Director to the same extent as if such services were
being performed by the savings association on its own premises. . . .[23]

Further, § 5(d)(7)(E) of the HOLA[24] specifically authorizes the OTS Director to issue
regulations and orders, including enforcement orders issued pursuant to § 8 of the Federal
Deposit Insurance Act ("FDIA")),[25] as may be necessary to enable the Director to
administer and carry out the purposes of the paragraph.  These provisions make clear that
OTS has the authority to examine, regulate, and take enforcement action against any
entity, including the Agents, with which a federal savings association contracts to
perform activities authorized by the HOLA.

    Another source of authority for OTS to examine third parties is  § 5(d)(1)(A) of
the HOLA.[26]  This provision gives OTS the authority to enforce § 8 of the FDIA.  Section
8 of the FDIA authorizes OTS to take enforcement action against savings associations
and "institution-affiliated parties" that OTS believes may be engaging in unsafe and
unsound thrift practices.  As defined in the FDIA, the term "institution-affiliated party"
includes an agent for an insured depository institution, and an independent contractor that
"knowingly or recklessly participates in . . . any violation of any law or regulation; . . .
[or] any unsafe or unsound practice" that is likely to cause significant loss or adverse
effect to a thrift.[27]  Therefore, in appropriate circumstances, § 8 of the FDIA may provide
OTS jurisdiction to take an administrative enforcement action against a third party or
agent.

**B.  The Structure of Federal Savings Association Operations, Including Use of
    Subsidiaries, Third Parties, and Agents, is Subject to OTS Oversight and
    Regulation**

    Given the broad mandates provided by the HOLA and OTS regulations, federal
savings associations are free to decide how to structure their operations and conduct their
authorized banking-related activities, subject only to OTS's regulatory authority and the
statutory mandate to operate safely and soundly in accordance with the best practices of
thrift institutions in the United States.  OTS regulations permit federal savings

---

[23]  12 U.S.C.A. §1464(d)(7)(D) (West 2001 & Supp. 2004).

[24]  12 U.S.C.A. § 1464(d)(7)(E) (West Supp. 2004).

[25]  12 U.S.C.A. § 1818 (West 2001 & Supp. 2004).

[26]  12 U.S.C.A. § 1464(d)(1)(A) (West Supp. 2004).

[27]  12 U.S.C.A. § 1813(u)(1) and (4) (West 2001 & Supp. 2004).

9

associations to conduct activities in subsidiaries.[28]  A federal savings association's decision to conduct a particular activity in an operating subsidiary, for example, is an integral part of the association's structural operations, which OTS has exclusive authority to govern and regulate.  Federal savings associations thus own and control their operating subsidiaries, and the subsidiaries' activities are strictly limited to those activities that are authorized for the association.[29]

OTS regulations provide that state laws apply to operating subsidiaries of federal savings associations only to the extent state laws apply to the parent federal savings association.[30]  This reflects OTS's long-held view that because an operating subsidiary may only engage in activities permissible for its parent federal savings association and must be controlled and majority owned by the association, an operating subsidiary is the equivalent of a department or division of the parent federal savings association for regulatory and reporting purposes.[31]  Thus, because state licensing and registration requirements do not apply to federal savings associations when they are conducting lending and deposit activities,[32] OTS has concluded that such state licensing and registration requirements also do not apply to the operating subsidiary.[33]  This is in large part due to the control the association has over the operating subsidiary and the OTS-imposed operational restrictions that are on the operating subsidiary.  Accordingly, when a federal savings association chooses to conduct authorized deposit and lending activities through an operating subsidiary, the operating subsidiary need not comply with state licensing and registration requirements that do not apply to the association.

It is beyond question that federal savings associations are authorized to contract with third parties to perform a variety of authorized activities for the association.  As

---

[28]  12 C.F.R. Part 559 (2004).

[29]  12 C.F.R. §§ 559.2 and 559.3 (2004).  To qualify as an operating subsidiary of a federal savings association, the association must own, directly or indirectly, more than 50% of the voting shares of the entity; no other person or entity may exercise effective operating control of the entity; and the entity may only engage in activities that are permissible for a federal savings association.

[30]  12 C.F.R. § 559.3(n) (2004).

[31]  See Preamble to Final Rule: "Federal Savings Associations: Operating Subsidiaries and Service Corporations," 57 Fed. Reg. 48942, 48945 (Oct. 29, 1992), and Preamble to Final Rule: "Subsidiaries and Equity Investments," 61 Fed. Reg. 66561, 66563 (Dec. 18, 1996).  See also OTS Op. Acting Chief Counsel (October 17, 1994) at 3.

[32]  12 C.F.R. §§ 557.12(g) (deposits) and 560.2(b)(1) (lending) (2004).  See also, OTS Op. Sr. Dep. Chief Counsel (November 20, 1992) (mortgage banking registration and licensing).

[33]  See e.g., OTS Ops. Chief Counsel (July 26, 1999 and July 29, 1999) (state mortgage lender licensing and registration requirements); OTS Op. Chief Counsel (August 19, 1997) (state lender license, net worth, bonding, and other requirements); and OTS Op. Acting Chief Counsel (October 17, 1994) (state license and registration requirements for consumer lending and mortgage banking).

10

discussed above, Congress explicitly recognized in the Examination Parity Act the ability of federal savings associations to contract with third parties. Both OTS and its predecessor, the FHLBB, have long recognized the authority of federal savings associations to contract with third parties to obtain correspondent services such as check clearing, bill collections, loan participations, investment advice, electronic data processing, and back office functions.[34] Similarly, federal savings associations have the authority to contract out to third parties loan servicing functions.[35] OTS long ago concluded that the authority to accept deposits, make loans, and provide other basic banking services necessarily includes the power to contract with others to obtain assistance in providing those services.[36] Marketing, solicitation, and providing customer assistance are functionally no different than many of the services described above. Indeed, with respect to customer assistance, the Association's use of Agents is akin to outsourcing the function of a customer service representative.

Federal savings associations have the ability to decide how they market and solicit their banking products and services, subject to OTS's regulatory oversight.[37] This principle is not abrogated, nor should state license and registration requirements become applicable, merely because an association contracts with a third party to perform marketing, solicitation, and customer service activities. This is particularly true where, as here, the Agents are exclusive, are required to undergo training, and are subject to the Association's supervision and control. The Association is therefore free to use its Affiliate's network of agents as an effective and efficient means of marketing the Association's products and services. Moreover, the Association's use of the Agents in these circumstances may result in greater credit distribution channels, which in turn, has the potential to lower the cost of credit.

---

[34] *See* 48 Fed. Reg. at 23035; 47 Fed. Reg. 17468, 17469 (Apr. 23, 1982); FHLBB Op. by Long (January 13, 1984); FHLBB Op. by Barnett (November 10, 1982). *See also* FHLBB Op. by Williams (December 3, 1985) (savings associations may contract with vendors for certain core and optional systems, programs, and services); FHLBB Op. by Raiden (February 7, 1985) (savings associations may contract for discount brokerage services); OTS Op. Chief Counsel (December 30, 1994) at n. 2 (citing *U. S. v. Citizens & Southern Nat'l. Bank*, 422 U.S. 86, 114 (1975)).

[35] *See e.g.*, OTS Op. Acting Chief Counsel (January 31, 1994) at n.4 (indicating permissibility of association using another company to perform document custodial functions and noting that savings associations "frequently use other companies to assist them in servicing loans for themselves and others").

[36] *See* OTS Op. Chief Counsel (August 28, 1995) at 4 (savings associations have authority to contract with affiliated insured depository institution to obtain basic banking services for their customers) and OTS Op. Chief Counsel (December 30, 1994) at n.2 ("The statutory authority of federal savings associations to accept deposits, make loans, and provide other basic banking services . . . necessarily includes within it the power to contract with others to assist in providing those services – subject, of course, to principles of safety and soundness.").

[37] *See e.g.*, 12. C.F.R. § 563.27 (2004), OTS's regulation on advertising by savings associations. Pursuant to § 8 of the Federal Deposit Insurance Act, 12 U.S.C.A. § 1818, OTS also may take enforcement action against a savings association for violating § 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45 (West 1997 & Supp. 2004), which prohibits unfair and deceptive practices in or affecting commerce.

11

### C. Impermissible State Interference with Performance of Authorized Activities

The state licensing and registration requirements about which you inquire interfere and conflict with the authority of the Association to exercise its deposit and lending powers by limiting the Association's ability to market its products and services in the manner it chooses, here, by using the Agents. The state requirements also thwart the congressional objective that OTS have exclusive responsibility for regulating the operations of federal savings associations "giving primary consideration of the best practices of thrift institutions in the United States."[38] To the extent a state law purports to regulate the way in which a federal savings association can perform its authorized activities, the state law is an impermissible interference with association powers and with OTS's regulatory authority.

As stated above, federal savings associations have the freedom to make business decisions about the manner in which they will conduct their operations. This includes decisions as to how to market and offer the association's products and services, and how to best facilitate customer access to, and applications for, such products and services. An association's decision as to how to conduct its operations and market its products and services should not result in the association being subjected to a hodgepodge of state requirements. An association should not be hamstrung in the exercise of its authorized powers merely because it chooses to market its products and services using agents whose activities the association closely monitors and controls.

Thus, a state may not interfere with the marketing and sale of a traditional banking product, such as a certificate of deposit ("CD"), by defining or construing a CD as a security or imposing registration requirements on the marketing and sale of CDs. Under OTS regulations, a federally insured CD is not a "security" and the regulation excludes from the definition of security "an account or deposit insured by the Federal Deposit Insurance Corporation."[39] OTS's exclusion of federally-insured CDs from the term "security" is consistent with the federal securities laws as interpreted by the Supreme Court.[40] OTS regulates the marketing, sale, and issuance of CDs by federal savings

---

[38] 12 U.S.C.A. § 1464(a).

[39] 12 C.F.R. § 561.44 (2004).

[40] *See Marine Bank v. Weaver*, 455 U.S. 551, 557-59 (1982); Securities Act of 1933, 15 U.S.C.A. § 77b (West 1997), and the Securities Exchange Act of 1934, 15 U.S.C.A. § 78c (West 1997) ("'34 Act"). *See also*, § 206 of the Gramm-Leach-Bliley Act ("GLBA"), Pub. L. 106-102, § 206, 113 Stat. 1338, 1393 (November 12, 1999), which provides that "a deposit account, savings account, certificate of deposit, or other deposit instrument issued by a bank" is an "identified banking product" for purposes of certain sections of the '34 Act, and §§ 201 and 202 of GLBA, which amended the '34 Act to exclude from the definitions of "broker" and "dealer" banks that buy, sell, or effect transactions in "identified banking products."

12

associations. There is no need for duplicate state regulation and, in fact, such duplicative regulation would conflict with the HOLA and OTS regulations.

Subjecting the Association, through its Agents, to state licensing and registration requirements impermissibly interferes with and burdens the Association's deposit and lending operations. Such requirements are tantamount to the state attempting to assume regulatory authority over federal savings association operations. As noted above, various states have differing requirements. Subjecting a federally chartered savings association to such myriad requirements and burdens merely because it markets its products through agents is inconsistent with, and contrary to, the notion of a federal charter. This is particularly true where, as here, the Association's Agents (i) are exclusive, and market only the Association's banking products and services, (ii) receive training in the Association's products and in compliance laws, and (iii) are subject to the Association's control. We note that the authority of national banks to make loans has been found to include the authority to use agents to market the bank's loan products and that the agents therefore need not comply with a state licensing requirement.[41]

Subjecting federal savings associations that use agents to the burdens of complying with a "hodgepodge of conflicting and overlapping state lending requirements" undermines the federal objective of permitting federal savings associations to exercise their lending powers "under a single set of uniform federal laws and regulations. This [uniformity] furthers both the 'best practices' and safety and soundness objectives of the HOLA by enabling federal thrifts to deliver low-cost credit to the public free from undue regulatory duplication and burden."[42] Having to ascertain and comply with diverse state requirements in order to perform authorized banking activities through the Agents has had a significant impact on the Association's ability to exercise its lending and deposit powers. As previously indicated, the Association heretofore has had to review, and then follow from year to year, the lending laws and securities laws of numerous states to keep abreast of any changes and to engage in numerous discussions with officials in several states, merely because the Association chooses to use the Agents, whom it controls, to perform advertising, solicitation, and customer service functions.

---

[41] *See* 66 Fed. Reg. 28593, 28594 – 28596 (May 23, 2001), Letter dated May 18, 2001, from First Sr. Dep. Comptroller and Chief Counsel, Office of the Comptroller of the Currency, to National City Bank and Huntington National Bank. The letter concluded that the authority of national banks to make loans includes the authority to use agents, therefore, federal law preempts conflicting state law.

[42] Preamble to OTS Final Rule: "Lending and Investment," 61 Fed. Reg. 50951, 50965 (Sept. 30, 1996).

13

The time and expense associated with that type of continuing review and discussion, and the costs associated with registering and licensing the Agents in numerous states, are impermissibly burdensome.[43] Moreover, the fact that the Association has chosen not to offer its products and services in some states due to the burdensomeness of the state requirements demonstrates that the state requirements are having an impermissible impact on the Association's deposit and lending operations. Obviously, the Association would not be subject to these burdens if it performed the marketing, solicitation, and customer service activities itself. In our view, the Association should not be subject to these burdens merely because the Association chooses to use the Agents to assist in the marketing of its products and services.

As noted above, the Association controls and reviews the activities the Agents perform on behalf of the Association, and no other entity exercises effective operating control over the Agents' activities on behalf of the Association.[44] Where an association exercises sufficient control over an agent's performance of authorized banking activities, the agent, like an operating subsidiary of a federal savings association, will be subject to OTS regulation and supervision, and federal preemption of state license and registration requirements applies to the agent, just as it would apply to an operating subsidiary. Whether a federal savings association exercises sufficient control over its agent in particular circumstances will be a factual question. Based on our review of the facts, circumstances, and representations of the Association and its counsel in the instant matter, we are satisfied that the Association exerts sufficient control over the Agents. As also noted above, based on authority deriving from two statutory provisions, OTS has the authority to examine, regulate, and take enforcement action against, the Agents. An examination of the Agents by OTS would include, among other things, review of compliance with numerous federal laws and regulations that are designed to protect consumers.[45]

In addition to the regulatory and enforcement authority OTS has over the Association and the Agents, OTS can indirectly regulate and supervise the relationship between the Association and the Agents in a variety of ways. For example, OTS can, if it chooses, require the Association to (i) obtain OTS approval before entering into or

---

[43] As noted earlier, the Association pays approximately $[ ] million annually in state license and registration fees.

[44] *Cf.* 12 C.F.R. § 559.3(c)(1) (2004) (ownership and control requirements for an operating subsidiary of a federal savings association).

[45] Such federal laws include each of the laws and regulations listed in note 3, *supra*, as well as OTS's Advertising regulation at 12 C.F.R. § 563.27 (2004); the Fair Housing Act, 42 U.S.C.A. § 3601 *et seq.* (West 2003 & Supp. 2004) and its regulations at 24 C.F.R. Part 100 *et seq.*; and RESPA and Regulation X. We again note that the Association also must ensure that its arrangements with the Agents comply with RESPA.

14

renewing contractual agreements with the Agents including, in OTS's discretion, approval of specific contract language; (ii) provide the Agents with specific training (over and above that currently provided by the Association) in the Association's products and services, compliance issues, and other areas before the Agents engage in marketing and solicitation activities on behalf of the Association; (iii) obtain periodic reports from the Agents pertaining to their performance of activities on behalf of the Association; and (iv) limit or terminate its relationship with one or more Agents.

Finally, we note that the state licensing and registration requirements would fail even under the standards applicable to state laws that generally are not preempted by federal law and regulations. Under OTS lending regulation § 560.2(c), certain types of state laws are not preempted "to the extent they only incidentally affect the lending operations of Federal savings associations" and are consistent with the purposes of the regulation. Other laws are not preempted if OTS, upon review, finds that the law furthers a vital state interest and either "has only an incidental effect on lending operations" or is not otherwise contrary to the purposes expressed in the regulation. OTS's deposit regulation at § 557.13 sets forth similar standards for deposit-related activities. As discussed above, the types of state licensing and registration requirements at issue here have more than an incidental impact on the Association's lending and deposit activities.

### III. Conclusion

We have concluded that as the Association is authorized under the HOLA to engage in taking deposits and making loans, the Association is free to choose how it will market its products, including through the Agents. We have reviewed the relationship between the Association and its Agents, including training, oversight, and supervision. Based on our review, we are satisfied that the Association exercises sufficient supervision control over the Agents to warrant a finding that the state licensing and registration requirements do not apply when the Agents perform marketing, solicitation, and customer assistance activities on behalf of the Association for the Association's banking products and services. The state law requirements at issue frustrate the Association's ability to exercise its deposit taking and lending authority by limiting the Association's use of the Agents as marketing channels. The state laws would operate so as to indirectly apply state licensing or registration requirements to the Association as a precondition to exercising powers granted under federal law.[46] Such state laws are inconsistent with the

---

[46] It should be noted that we are not here addressing, and we express no opinion with respect to, the use of agents to offer (i) products that are not traditional banking products or services, (ii) insurance products, or (iii) products or services that are functionally regulated by another federal regulator. In addition, we are not suggesting that an agent that performs banking or other activities for entities other than federal savings associations would not have to comply with state licensing and registration requirements. In other words, if there is an independent basis for requiring such registration, the agent would not be exempt from the registration requirement merely because the agent performs similar activities for a federal savings association.

15

authority of the Association to exercise its deposit and lending powers and with the OTS's exclusive regulatory authority. Such laws therefore do not apply to the Association or its Agents.

Our conclusions herein are based on the particular facts and circumstances described above. Other federal savings associations that wish to use agents to assist in marketing the association's banking products and services must first (1) consult with their appropriate OTS Regional Office and (2) submit a business plan or proposal that provides in-depth information about how the arrangement with the agents will be structured and carried out. In addition, an association must comply, at a minimum, with the conditions set forth in Appendix A, attached hereto, in connection with any arrangement with agents. [47]

In reaching the foregoing conclusions, we have relied on the factual statements and representations made in the materials you submitted to us and in subsequent conversations with OTS staff, as summarized herein. Our conclusions necessarily depend on the accuracy and completeness of those facts. Any material difference in facts or circumstances from those described herein could result in different conclusions.

We trust that this is responsive to your inquiry. If you have further questions, please contact Vicki Hawkins-Jones, Special Counsel, at (202) 906-7034, or Deborah Dakin, Senior Deputy Chief Counsel, at (202) 906-6445.

Sincerely,

John E. Bowman
Chief Counsel

cc:     Regional Directors
        Regional Counsel

---

[47] The conditions set forth in Appendix A were developed in conjunction with OTS Policy Offices and, therefore, reflect legal, supervisory, and safety and soundness concerns.

16

## APPENDIX A - CONDITIONS

Other federal savings associations that wish to use agents to perform marketing, solicitation, customer service, or other activities related to the association's authorized banking products or services must comply with the following conditions:

- The association and the agent must enter into a written agreement that (1) sets forth the rights, duties, and obligations of each, including those with respect to training; (2) describes the nature of the relationship between the two parties; (3) expressly sets forth the association's right to monitor and review the activities the agent performs for the association; and (4) expressly sets forth OTS's statutory authority to regulate and examine and take an enforcement action against the agent with respect to the activities it performs for the association, and the agent's acknowledgment of OTS's authority;

- The association must establish a system that provides the agent with in-depth training about the association's products and services, as well as applicable law. Such training should be designed to insure that agents will be adequately educated about the association's products and services, the distinctions between insured and non-insured products, and relevant law (*e.g.,* truth in lending, truth in savings, real estate settlement procedures, equal credit opportunity, fair lending, etc.) that may apply to the agents' marketing, solicitation, and customer service activities. Such training must be provided *before* an agent commences marketing or other service activities on behalf of the association; thereafter, the association will review and update the training material on an annual basis and ensure that each agent receives training as needed. Training records must be available for review by OTS examiners;

- The association must adopt a detailed compliance program to ensure adequate monitoring, supervision, and control over the agent and the activities the agent performs on behalf of the association. The compliance program must be reviewed by the association's board of directors and senior management on an annual basis and must include:

  - The designation of a compliance officer dedicated to the development, implementation, and management of the association's compliance program. This person will have responsibility for the oversight of the agents that perform marketing, solicitation, customer service, or other activities related to the association's authorized banking products or services;

17

o   An annual review of the compliance program conducted under the auspices
    of the compliance officer to determine if the agents are operating in
    compliance with the association's established policies and procedures
    regarding the marketing, solicitation, customer service, or other activities
    related to the association's authorized banking products or services;

o   An annual internal or external audit review of the compliance program,
    including a review of the training component;

o   Compliance and audit reports, together with evidence of appropriate actions
    to address findings, to be provided to the association's board of directors;

o   A system for tracking and resolving consumer complaints in a timely
    manner.  An annual report regarding consumer complaints and their
    resolution shall be provided to the association's board of directors;

o   A review and approval process for all customer disclosures, advertising,
    and other promotional material; and

o   Any other requirements or conditions that the association's OTS Regional
    Office deems appropriate for that particular institution.

Moreover, the written agreement between the federal savings association and its agent
shall specify that the association, as well as the agent, is subject to control and
supervision by the appropriate OTS Regional Office or OTS Headquarters.  This control
and supervision includes, but is not limited to, the ability to require that:

•   The association obtain OTS's approval (or non-objection) before entering into a
    contractual arrangement with the agent, including the right to approve specific
    contractual language;

•   The association and/or the agent submit periodic reports to OTS; and

•   The association modify or terminate its relationship with the agent.